**UNITED STATES of America ex rel. MORONGO BAND OF MISSION INDIANS, Plaintiff–Appellee,**

v.

**Frank ROSE, Defendant–Appellant.**

No. 92–56180.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 11, 1994.

Decided Sept. 8, 1994.

David M. Liberman, Los Angeles, CA, for defendant-appellant.

George Forman, Alexander & Karshmer, Berkeley, CA, for plaintiff-appellee.

Before: BRIGHT *, WIGGINS, and T.G. NELSON, Circuit Judges.

WIGGINS, Circuit Judge:

Appellant Frank Rose appeals the imposition of a $25,000 fine for violations of a bingo ordinance enacted by the Morongo Band of Mission Indians (the "Band"). The case is on its second visit to this court. In the first sojourn, we held that a suit to enforce the tribal ordinance against a non-Indian presented a federal question of the Band's "disputed ability, under the principles of federal common law, to apply that power against one outside of its community." *Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1077 (9th Cir.1990) (hereinafter *"Morongo I"*); *see also Chilkat Indian Village v. Johnson*, 870 F.2d 1469 (9th Cir.1989). This appeal involves that very same dispute of tribal authority, among other issues.

*I. Facts and Prior Proceedings*

Though the basic facts are accurately recited in *Morongo I*, we repeat them here with some additional details relevant to this appeal.

In April of 1983, Appellee Morongo Band of Mission Indians ("Appellee" or the "Band") adopted an ordinance regulating the playing of bingo and establishing the Morongo Tribal Bingo Enterprise. At the same time, the Band entered into a lease with Clive "Sonny" Miller ("Miller"), a member of the Band, to use for the games a building located on allocated trust land belonging to Miller. The Band also entered into a management agreement with Justus Enterprises, Inc. ("Justus") whereby Justus would operate the games and manage the enterprise in return for 49 percent of the operating profits, and 95% of the profits after the Band's share exceeded half a million dollars. The Band approved the three documents by a bare majority vote. The Band's attorney forwarded the Management Agreement and Lease to

the Bureau of Indian Affairs ("BIA") for approval "if possible."

Concurrently, Miller and Justus executed a Joint Venture Agreement, which directed that, in the event of termination of the agreement by Miller for breach by Justus, "Owner [Miller] will retain all sums accrued or paid to him to that date and Manager [Justus] will assign to Owner all of its rights under the management agreement to be entered into by Manager and Band...."

Days later, the Band, having undergone a change in leadership, began to reconsider its Bingo Enterprise. A new attorney requested that the BIA withhold approval of the contracts so that the Band could try to get more favorable terms. The Band seemed concerned with the amount being paid to Miller. On January 17, 1984, the Band's attorney informed Justus' attorney that the Band had decided to terminate the existing bingo operation and that, while it would consider new proposals from Justus, it would not consider any arrangement involving the lease of Miller's land. The Band rescinded the Management Agreement on the grounds that it was procured through misrepresentation, that it was void because it had not been approved by the BIA, and that Justus had breached the Agreement by failing to make an accounting and make payment for the first fiscal year of operation. Justus paid amounts payable to Miller into the district court as part of an interpleader action. The Bingo Enterprise was to be terminated on February 10, 1984.

Miller, however, believed that his lease with the Band was still valid and that he had succeeded to Justus' rights under the Management Agreement by the terms of their Joint Venture Agreement. He decided to continue holding bingo games on his property, turning to Rose, an experienced bingo advisor, for help in running the games. Rose was a consultant and had no ownership or equity interest in Miller's bingo operation.

On September 5, 1984, the Band filed the current action against Miller and Rose in the

---

* Hon. Myron H. Bright, Senior United States Circuit Judge for the Eighth Circuit, sitting by desig-

nation.

district court, seeking both to enjoin the bingo operation and to collect penalties of $500 for each violation of its bingo ordinance. *See* Ordinance ¶ 5(b), ER 50. The bingo operation was seized by United States Marshalls.

The district court first dismissed the entire action for lack of jurisdiction, and the Band appealed. While the appeal was pending, the Band stipulated to the dismissal of the appeal as to Miller. The district court's original dismissal of the claim against Rose for lack of subject matter jurisdiction was reversed by *Morongo I.* On remand, Rose moved to dismiss the complaint for failure to join Miller as an indispensable party and for failure to state a claim upon which relief could be granted. The district court denied that motion.

The district court granted summary judgment to the Band as to liability. A two-day trial was held to determine the extent of Rose's liability. The court determined that Rose should be liable for one-fourth of the penalties under the ordinance. Final judgment in the amount of $25,000 against Rose was entered on August 14, 1992. Rose appeals, arguing (1) that the contracts provide a defense to the enforcement of the ordinance, (2) that the Band did not have the authority to enforce its ordinance against him, a non-Indian, and (3) that the complaint should have been dismissed for the failure to join Miller.

## II. The Contractual Defense

 Rose claims that the entry of summary judgment against him on liability was error because the district court concluded that the Management Agreement and Joint Venture Agreement provide Rose with no defense against the operation of the ordinance. He claims that the rights of Justus to conduct the games under the Management Agreement were assigned to Miller by the Joint Venture Agreement, making the games conducted by Miller and Rose authorized under the ordinance. This court reviews de novo the application of the principles of contract interpretation to the facts. *Aetna Casualty and Surety Co. v. Pintlar Corp.,* 948 F.2d 1507, 1511 (9th Cir.1991). The interpretation of a statute is a question of law reviewed de novo. *E.g., Mt. Graham Red Squirrel v. Espy,* 986 F.2d 1568, 1571 (9th Cir.1993).

██ Section 81 of 25 U.S.C. declares that certain contracts with a tribe of Indians or individual Indians are null and void unless approved by the Secretary of the Interior and the Commissioner of Indian Affairs.[1] The district court concluded that the lack of approval of the Management Agreement and Joint Venture Agreement rendered them void and no basis for a defense against liability. Rose argues that the contracts did not require approval for two reasons. First, the contracts authorizing the bingo games were allegedly between the Band and Miller, an Indian, because Justus had assigned its rights to Miller. Rose argues that section 81 is intended to guard against unconscionable or exploitative contracts between Indians or tribes and non-Indians. Second, Rose claims that the contracts were not "relative to [Indian] lands" because the facility was to be located on Miller's allotted trust land, and because the Management Agreement did not give Justus the exclusive right to operate bingo on the reservation.

We find no merit in Rose's contentions. The contract authorizing the games, the Management Agreement, was clearly between the band and a non-Indian, Justus. Failure to get BIA approval made the contract a nullity from the outset. To find that the fact that Miller was a member of the Band made any difference, one would have to

---

1. That section provides, in pertinent part:

 No agreement shall be made by any person with any tribe of Indians, or individual Indians not citizens of the United States, for the payment or delivery of any money or other thing of value, in present or in prospective, or for the granting or procuring any privilege to him, or any other person in consideration of services for said Indians relative to their lands ...

 unless such contract or agreement be executed and approved as follows:.... Second, it shall bear the approval of the Secretary of the Interior and the Commissioner of Indian Affairs indorsed upon it.... All contracts or agreements made in violation of this section shall be null and void....

 25 U.S.C. § 81.

conclude that the purported assignment worked a novation of an otherwise void contract. Even if that were possible, there was no assignment because there was no approval thereto as required by 25 U.S.C. § 84. Miller and Rose, therefore, did not accede to the benefits of the Management Agreement.

■ Rose also fails to establish that the contract was not "relative to [Indian] lands." This court and the Seventh Circuit have held that section 81 controls contracts involving bingo facilities located on tribal trust lands. *A.K. Management Co. v. San Manuel Band of Mission Indians*, 789 F.2d 785, 787 (9th Cir.1986) ("The broad language of section 81 expresses congressional intent to cover almost all Indian land transactions."); *Wisconsin Winnebago Bus. Comm. v. Koberstein*, 762 F.2d 613, 619 (7th Cir.1985). *Barona Group of Capitan Grande Band of Mission Indians v. American Management & Amusement, Inc.*, 840 F.2d 1394 (9th Cir. 1987), *cert. dismissed*, 487 U.S. 1247, 109 S.Ct. 7, 101 L.Ed.2d 958 (1988), cited by Appellant, does not support Appellant's claim that courts have found section 81 controlling only where unallotted tribal trust lands are involved. In fact, the *Barona* court held that section 81 controlled where the lands were on the reservation, even though the lands involved apparently were *not* trust lands. *Id.* at 1398 (quoting BIA, which did not believe approval was required because "trust lands and funds are not involved"). Moreover, that case held that a bingo management agreement was "relative to" Indian lands because it granted the exclusive right to operate bingo games. *Id.* at 1403–04. The Management Agreement in this case granted Justus the exclusive right to operate for-profit bingo games on the reservation. The district court did not err by holding that BIA approval was required.

We find no error in the district court's conclusion that the contracts between the Band, Justus, and Miller provide Rose with no defense against the enforcement of the bingo ordinance.

*III. Tribal Authority over Non–Indians*

■ Rose argues that the bingo ordinance may not be enforced against him, a non-Indian, based on activities occurring on Miller's allotted trust lands. Tribal jurisdiction over non-Indians is a question of federal law reviewed de novo. *FMC v. Shoshone–Bannock Tribes*, 905 F.2d 1311 (9th Cir.1990), *cert. denied*, 499 U.S. 943, 111 S.Ct. 1404, 113 L.Ed.2d 459 (1991).

The district court determined that the bingo ordinance fell into one of the exceptions to a general divestiture of tribal authority described by *Montana v. United States*, 450 U.S. 544, 564, 101 S.Ct. 1245, 1257–58, 67 L.Ed.2d 493 (1981). In *Montana*, the Court held that there had been a general divestiture of tribal authority over the actions of non-Indians on lands alienated to non-Indians under the General Allotment Act and the Crow Allotment Act of 1920, 41 Stat. 751. 450 U.S. at 559, 101 S.Ct. at 1255. The Court proceeded to consider whether the authority to regulate hunting and fishing was retained as an incident of "inherent sovereignty" of the tribe. *Id.* at 563, 101 S.Ct. at 1257; *see also United States v. Wheeler*, 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978) (holding that tribe's authority to punish member of tribe for violation of tribal criminal law is an aspect of inherent tribal sovereignty retained by the tribe). *Montana* defined two exceptions from the general presumption against sovereignty of the tribe over non-Indians on non-Indian fee lands.

A tribe may regulate, through taxation, licensing or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases or other arrangements. A tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe.

450 U.S. at 565–66, 101 S.Ct. at 1258 (citations omitted); *see also South Dakota v. Bourland*, —— U.S. ——, ——, 113 S.Ct. 2309, 2320, 124 L.Ed.2d 606 (1993) (endorsing the *Montana* analysis).

The district court concluded that Rose "entered into a consensual contractual relationship with tribe members, specifically Mr. Miller, and engaged in an activity, bingo, which the tribe sought to control through licensing." In addition, the court was of the opinion that the unauthorized bingo "affected the economic security and welfare of the tribe since it involved significant amounts of money, attracted many tribe members and lacked the requisite approval by the [BIA]." In determining that the ordinance was necessary to protect tribal self-government, the district court also relied upon the Supreme Court's explanation, in *California v. Cabazon Band of Mission Indians,* 480 U.S. 202, 216–19, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987), that there is a federal policy to encourage the economic self-sufficiency of the tribes through bingo.

Appellant argues that courts have found an implicit divestiture of tribal sovereignty in areas involving relations between a tribe and nonmembers of the tribe, meaning that a tribe generally lacks authority over non-Indians. Appellant also argues that the Band's exercise of authority over him is precluded by the fact that the activities occurred on Miller's allotted trust land. The General Allotment Act of 1887, codified at 25 U.S.C. § 331, allows land on reservations to be "allotted for the exclusive use of individual Indians." *Colville Confederated Tribes v. Walton,* 647 F.2d 42, 49 (9th Cir.), *cert. denied,* 454 U.S. 1092, 102 S.Ct. 657, 70 L.Ed.2d 630 (1981).

Rose further claims that the exercise of authority cannot be premised upon a "consensual commercial relationship" if the Miller and Justus contracts are found void for lack of BIA approval. He also argues that the unauthorized bingo operation was a benefit, not a threat, to tribal economic security. Finally, Appellant contends that this federal policy favoring economic self-sufficiency of individual Indians would be impaired by allowing the tribe to enforce its ordinance against him.

■ We disagree with Rose's various arguments and affirm on the basis of *Montana.* Strictly speaking, the *Montana* exceptions are relevant only after the court concludes that there has been a general divestiture of tribal authority over non-Indians by alienation of the land. Rose argues that the allotment of the land to Miller should so divest the Band of authority. *Montana* itself, however, only establishes that alienation of lands in fee to non-Indians presumptively divests the Band of authority. In this case, the land, though allotted under the General Allotment Act, was allotted to Miller, an Indian, and held in trust for him by the United States.[2] We recognize, therefore, that there is an open question about whether or not the Band generally has the authority to impose regulations such as its ordinance against non-Indians on Indians' trust allotments.[3]

■ We express no opinion on whether the tribe generally retains sovereign authority over the activities of non-members on allotted trust lands such as Miller's, however, because we conclude that the band would retain authority under the first *Montana* exception even if it had generally divested its authority as by conveyance of the land in fee

2. Rose does not make clear the exact status of Miller's trust lands. We assume that Miller holds his land as a typical trust allotment of reservation land, *see* 25 U.S.C. §§ 331, 347, 349; Felix S. Cohen, *Handbook of Federal Indian Law* 615 (1982) ("[Trust] allotment is a term of art in Indian law, describing ... a parcel of land owned by the United States in trust for an Indian."), though a different sort of allotment would not change our analysis.

3. The Supreme Court has upheld the power of tribes to tax transactions occurring on tribal trust lands. *Washington v. Confederated Tribes of the Colville Indian Reservation,* 447 U.S. 134, 152, 100 S.Ct. 2069, 2080–81, 65 L.Ed.2d 10

(1980). In *Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 137–144, 102 S.Ct. 894, 902–05, 71 L.Ed.2d 21 (1982), the Court held that a tribe may impose taxes on businesses operated by non-Indians, based on authority derived from "the tribe's general authority, as sovereign, to control economic activity within its jurisdiction," and to raise revenue, as well as from its right to exclude non-Indians. *Id.* at 137, 102 S.Ct. at 902. However, the Court has more recently taken a narrow view of generally retained sovereign authority over non-members beyond the specific exceptions described by *Montana. Bourland,* —— U.S. at —— – —— & n. 15, 113 S.Ct. at 2319–20 & n. 15.

to non-members.[4] The "consensual commercial relationship" involved was not between Miller and the Band, as Appellant argues. It was, instead, between Appellant and Miller. The Band sought to regulate such bingo enterprises by licensing them (or, more accurately, monopolizing them for the benefit of the Band). The regulation in question therefore falls squarely within the first *Montana* exception, and we have no need to address the second exception. We affirm the district court's conclusion that the Band had authority to enforce its ordinance against Rose.

## IV. Indispensible Party

■ Appellant argues that the complaint should have been dismissed for failure to join an indispensable party, Miller. The district court denied the motion to dismiss, without explanation. A district court's decision concerning joinder pursuant to Fed. R.Civ.P. 19 is generally reviewed for an abuse of discretion. *Hughes v. United States,* 953 F.2d 531, 540 (9th Cir.1992); *Northern Alaska Envtl. Center v. Hodel,* 803 F.2d 466, 468 (9th Cir.1986). To the extent that the determination of whether the movant's interest is impaired involves an interpretation of law, it is reviewed de novo. *Hughes,* 953 F.2d at 540; *Aguilar v. Los Angeles County,* 751 F.2d 1089, 1092 (9th Cir.), *cert. denied,* 471 U.S. 1125, 105 S.Ct. 2656, 86 L.Ed.2d 273 (1985).

■ A court deciding whether an action must be dismissed for failure to join an indispensible party engages in a "two-part analysis: it must first determine if an absent party is 'necessary' to a suit; then if ... the party cannot be joined, the court must determine whether the party is 'indispensible' so that in 'equity and good conscience' the suit should be dismissed." *Makah Indian Tribe v. Verity,* 910 F.2d 555, 558 (9th Cir.1990).

The inquiry into whether the absent party is necessary involves a second, two-part analysis. Fed.R.Civ.P. 19(a);[5] *Makah,* 910 F.2d at 558–59. Rose first argues that "complete relief" could not be afforded the Band because the Band originally sought to enjoin Miller and other Indians from holding further bingo games. Rose relies more heavily on the alternative argument that Miller claims an interest relating to the subject of the action and that disposition of the present action would impair Miller's ability to protect that interest. Specifically, Rose argues that Miller's interests are implicated because the validity of the contractual defense asserted by both Miller and Rose must be determined in this action, and Miller is a party to the contracts in question.

■ We first consider whether "complete relief" is available to the Band. "This factor is concerned with consummate rather than partial or hollow relief as to those already parties, and with precluding multiple lawsuits on the same cause of action." *Northrop Corp. v. McDonnell Douglas Corp.,* 705 F.2d 1030, 1043 (9th Cir.1983), *cert. denied,* 464 U.S. 849, 104 S.Ct. 156, 78 L.Ed.2d 144 (1983). Outside the pecuniary relief, the Band sought sweeping declarations about its authority to enforce the bingo ordinance. The Band also sought permanent injunctive relief against Rose "and all other persons acting in concert with him or under his direction or control." Rose cites those passages for his claim that the band cannot

---

4. We note that the first *Montana* exception is not entirely distinct from the sovereign-authority holdings of *Washington v. Confederated Tribes* and *Merrion. See Babbitt Ford, Inc. v. Navajo Indian Tribe,* 710 F.2d 587, 593 (9th Cir.1983) (discussing inherent sovereign authority cases along with the *Montana* exceptions and holding automobile repossessors subject to exercise of tribal authority because they enter tribal lands and do business with members of the tribe), *cert. denied,* 466 U.S. 926, 104 S.Ct. 1707, 80 L.Ed.2d 180 (1984); Veronica L. Bowen, *The Extent of Indian Regulatory Authority Over Non–Indians: South Dakota v. Bourland,* 27 Creighton.L.Rev. 605 (1994).

5. Fed.R.Civ.P. 19(a) provides in pertinent part:

A person ... shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by result of the claimed interest.

**908**

obtain complete relief without Miller. We disagree. The Band may have sought relief beyond any within the power of the federal courts to grant. But such overreaching in the pleadings cannot mean that every non-Indian who might play bingo on the Band's land or every person who might associate himself with Rose in the future is a necessary party. Totally effective declaratory and injunctive relief clearly may be consummated against Rose, and complete relief may therefore be "accorded among those already parties." Fed.R.Civ.P. 19(a)(1).

 The second question is whether Miller must be joined if feasible in order to protect Miller's own interests. Rule 19(a)(2)(i) allows the moving party to assert that an absent party must be joined if feasible because "the disposition of the action in the person's absence may [ ] as a practical matter impair or impede the person's ability to protect [their] interest" in the action. Rose asserts that Miller may be adversely affected by the determination that the contracts do not provide a defense to the the enforcement of the bingo ordinance. The issue normally involves an inquiry into the possibility of the absent party being collaterally estopped in another proceeding. *See Takeda v. Northwestern Nat. Life Ins. Co.,* 765 F.2d 815, 821 (9th Cir.1985) (stating that "we need not conclusively determine how collateral estoppel would operate in future litigation," but only whether a "significant possibility" exists that the absent party would be estopped). In this case, however, such an inquiry would be inappropriate.

The purpose of Fed.R.Civ.P. 19(a)(2)(i) is to protect the legitimate interests of absent parties, as well as to discourage multiplicitous litigation. Ordinarily, any party may move to join any such interested party. In this case, however, the procedural history is such that it is inappropriate for one defendant to attempt to champion an absent party's interests. Miller was originally a defendant in the action, but he and the Band stipulated to his dismissal shortly after this court's resolution of the first appeal.[6] Therefore, Miller's voluntary dismissal indicates that Miller himself did not feel that it was necessarily in his interest to remain a party in this action. This is the best evidence that Miller's absence would not impair or impede his ability to protect his interests. Moreover, Miller filed declarations in support of his position, and Rose had every incentive to pursue the defense based on the contract[s] to which Miller was a party. "Impairment may be minimized if the absent party is adequately represented in the suit." *Makah,* 910 F.2d at 558. We believe that these facts provide a solid basis for a conclusion that Miller's interests would not be prejudiced by his absence.

Finally, Rule 19(a) provides that an absent party with an interest in the action must be joined where the absence may "leave any of the parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest." Such a risk is typically created by allocation of a limited fund to which absent parties are entitled. *Makah,* 910 F.2d at 559. Rose does not argue that Miller's absence will subject him to any such risks.

**6.** We know of no reason why Miller would have to be dismissed. While the federal courts have no subject matter jurisdiction over the enforcement by the Band of its own ordinances against its members, *Morongo I,* 893 F.2d at 1077, we know of no reason why the court could not have exercised supplemental jurisdiction over the claim against Miller. Except in cases where joinder destroys jurisdiction based solely on diversity, or in certain other cases in which the district court declines to exercise supplemental jurisdiction, "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties." 28 U.S.C. § 1367. Because subject matter jurisdiction was based on a federal question, the joining of Miller would not destroy diversity jurisdiction. Miller, moreover, had already made an appearance in the case, removing any question about personal jurisdiction. There is no indication that Rose sought to retain Miller as a party at the time of Miller's dismissal, probably because Rose is only interested in securing dismissal of the action against him, not in joining Miller.

Therefore, we conclude that Miller was not a "person to be joined if feasible" under Fed.R.Civ.P. 19(a). He therefore cannot be an indispensible party, and the district court was correct to deny the motion to dismiss the action against Rose for failure to join Miller.

## V. Conclusion

For the foregoing reasons, the judgment of the district court is AFFIRMED.