McMILLIAN, Circuit Judge,
with whom FLOYD R. GIBSON, BEAM, and DIANA E. MURPHY, Circuit Judges, join, dissenting.
I join in Judge Beam’s opinion concurring in part and dissenting in part, particularly the emphasis on the importance of geography or territory in analyzing issues of tribal sovereignty. I write separately to set forth the reasons why I would hold that the federal district court, and the tribal courts, correctly decided that the tribal court has subject matter jurisdiction over this reservation-based tort action between non-tribal members.
There are no disputed issues of fact relevant to the jurisdiction issue. None of the parties are tribal members. Gisela Freder-icks is a resident of the reservation; the truck driver, Lyle Stockert, and his employer, A-l Contractors, are not residents, but A-l was performing work on the reservation under a subcontract agreement with LCM Corp., a corporation wholly owned by the tribe, in connection with the construction of a tribal community building. Because the accident occurred within the exterior boundaries of the reservation, on a state highway right-of-way,[1] the cause of action arose on the reservation. The tribal code establishes personal and subject matter jurisdiction and applies tribal law and custom.
The legal issue presented, tribal court civil jurisdiction, is a question of federal law subject to de novo review. See, e.g., FMC v. Shoshone-Bannock Tribes, 905 F.2d 1311, 1313-14 (9th Cir.1990), cert. denied, 499 U.S. 943, 111 S.Ct. 1404, 113 L.Ed.2d 459 (1991). The jurisdiction issue is properly presented for determination on the merits. Tribal remedies have been exhausted, and we have the benefit of the tribal trial and appellate *946 courts’ opinions as well as that of the federal district court.
I would hold the tribal court has civil jurisdiction because of the presumption in favor of inherent tribal sovereignty, Montana applies only to issues involving fee lands, Iowa Mutual establishes more than a rule of exhaustion of tribal remedies, the Handbook of Federal Indian Law does not definitively resolve the issue, and state court jurisdiction does not preclude tribal court jurisdiction. Finally, I would hold that even if Montana applies, providing a forum for reservation-based tort actions, even where the parties are non-Indian, falls within both Montana exceptions.
INHERENT TRIBAL SOVEREIGNTY
The majority opinion would not extend inherent tribal sovereignty over the activities of non-members, absent consent or some direct effect on the tribe. I remain convinced that the opposite presumption applies, that is, that “[cjivil jurisdiction over such activities presumptively lies in the tribal courts unless affirmatively limited by a specific treaty provision or federal statute.” Iowa Mutual Insurance Co. v. LaPlante, 480 U.S. 9, 18, 107 S.Ct. 971, 977-78, 94 L.Ed.2d 10 (1987) (Iowa Mutual). See Hinshaw v. Mahler, 42 F.3d 1178, 1180-81 (9th Cir.) (tribal court jurisdiction over action brought by tribal member on behalf of non-tribal member child against non-tribal member arising out of car accident on reservation), cert. denied, — U.S.-, 115 S.Ct. 485, 130 L.Ed.2d 398 (1994).
Indian tribes possess “ ‘inherent powers of a limited sovereignty which has never been extinguished.’” United States v. Wheeler, 435 U.S. 313, 322, 98 S.Ct. 1079, 1085-86, 55 L.Ed.2d 303 (1978) (emphasis omitted), citing Felix S. Cohen, Handbook of Federal Indian Law 122 (1942 ed.). The Supreme Court has repeatedly emphasized that “there is a significant geographical component to tribal sovereignty.” White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 151, 100 S.Ct. 2578, 2587-88, 65 L.Ed.2d 665 (1980) (pre-emption of state authority over non-Indians acting on tribal reservations). See generally Allison M. Dussias, Geographically-Based and Membership-Based Views of Indian Tribal Sovereignty: The Supreme Court’s Changing Vision, 55 U.Pitt.L.Rev. 1 (1993). Thus, “Indian tribes retain ‘attributes of sovereignty over both their members and their territory ’ to the extent that sovereignty has not been withdrawn by federal statute or treaty.” Iowa Mutual, 480 U.S. at 14, 107 S.Ct. at 975, citing United States v. Mazurie, 419 U.S. 544, 557, 95 S.Ct. 710, 717-18, 42 L.Ed.2d 706 (1975) (emphasis added). Inherent tribal sovereignty “exists only at the sufferance of Congress and is subject to complete defeasance. But until Congress acts, the tribes retain their existing sovereign powers. In sum, Indian tribes still possess those aspects of sovereignty not withdrawn by treaty or statute, or by implication as a necessary result of their dependent status.” United States v. Wheeler, 435 U.S. at 323, 98 S.Ct. at 1086 (emphasis added). Implicit divestiture of inherent sovereignty has been found necessary only
where the exercise of tribal sovereignty would be inconsistent with the overriding interests of the National Government, as when the tribes seek to engage in foreign relations, alienate their lands to non-Indians without federal consent, or prosecute non-Indians in tribal courts which do not accord the full protections of the Bill of Rights.
Washington v. Confederated Tribes of Colville Reservation, 447 U.S. 134, 153-54, 100 S.Ct. 2069, 2081, 65 L.Ed.2d 10 (1980) (footnote omitted).
The federal policy favoring tribal self-government operates even in areas where state control has not been affirmatively pre-empted by federal statute. “[Ajbsent governing Acts of Congress, the question has always been whether the state action infringed on the rights of reservation Indians to make their own laws and be ruled by them.”
Iowa Mutual, 480 U.S. at 14, 107 S.Ct. at 975, citing Williams v. Lee, 358 U.S. 217, 220, 79 S.Ct. 269, 270-71, 3 L.Ed.2d 251 (1959). “Because the Tribe retains all inherent attributes of sovereignty that have not been divested by the Federal Government, the proper inference from silence ... is that the sovereign power ... remains intact.” Merrion v. Jicarilla Apache Tribe, 455 U.S. *947 130, 148 n. 14, 102 S.Ct. 894, 907 n. 14, 71 L.Ed.2d 21 (1982).
There is no ground for divestiture of inherent tribal sovereignty in the present case. No specific treaty provision or federal statute has been shown to affirmatively limit the power of the tribal courts of the Three Affiliated Tribes over civil actions that arise on the reservation, and the exercise of tribal civil jurisdiction over a tort action arising on the reservation between non-members does not implicate foreign relations, alienation of land, or the criminal prosecution of non-Indians.
STATUS OF LANDS AT ISSUE
First, Montana v. United States, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981), Brendale v. Confederated Tribes & Bands of the Yakima Indian Nation, 492 U.S. 408, 109 S.Ct. 2994, 106 L.Ed.2d 343 (1989) (Brendale), and South Dakota v. Bourland, 508 U.S. 679, 113 S.Ct. 2309, 124 L.Ed.2d 606 (1993) (Bourland), are not controlling. Montana and Brendale involved attempts by the tribes to regulate the activities of nonmembers on fee land, that is, land owned by non-members within the reservation; Bour-land involved lands taken by the federal government for the construction of a dam and reservoir. The distinction between land conveyed in fee to non-Indians pursuant to the Indian General Allotment Act of 1887, 24 Stat. 388, which was intended to eliminate the reservations and assimilate the Indian peoples, or, in Bourland, land taken by the federal government, and land owned by the tribe or trust land held by the federal government in trust for the tribe or individual members of the tribe, is fundamental to the analysis in Montana, Brendale and Bour-land. The present ease does not involve fee land or land taken by the federal government for public use. For that reason, I would apply Montana, and its exceptions, only to fee lands owned by non-tribal members.
A close reading of Justice Stewart’s opinion for the Court in Montana demonstrates the importance of geographical or territorial status of the land at issue to tribal sovereignty analysis. The Court’s analysis differentiated between fee lands and lands owned by the tribe or held in trust for the tribe. The competing regulatory authorities were the tribe and the state, each of which asserted the authority to regulate hunting and fishing by non-members within the reservation. The Court framed the issue in terms of “the sources and scope of the power of an Indian tribe to regulate hunting and fishing by non-Indians on lands within its reservation owned in fee simple by non-Indians. ” 450 U.S. at 547, 101 S.Ct. at 1249 (emphasis added), at 557, 101 S.Ct. at 1254. The Supreme Court held that the tribe could prohibit non-members from hunting or fishing on land owned by the tribe or trust land, id. at 557, 101 S.Ct. at 1254, and, if the tribe permitted non-members to fish or hunt on such lands, could condition their entry by charging a fee or establishing bag and creel limits. Id. However, the Court held inherent tribal sovereignty over the reservation did not extend to tribal regulation of non-Indian fishing and hunting on reservation land owned in fee by non-members. Id. at 564-65, 101 S.Ct. at 1257-58. The Court admitted that “Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands.” Id. at 565, 101 S.Ct. at 1258 (emphasis added). The first Montana exception recognizes tribal regulatory authority over non-members who enter consensual relationships with the tribe or its members. Id. The second Montana exception expressly recognizes a tribe’s “inherent power to exercise over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe.” Id. (emphasis added). If inherent tribal sovereignty can include civil jurisdiction over non-Indians on fee lands within the reservation, it should include civil jurisdiction over non-Indians on tribal land or trust land within the reservation. This is because tribal civil jurisdiction is more restricted on fee land than on tribal or trust land.
Brendale also involved fee lands within the reservation; the competing regulatory authorities were once again the tribe and the state (or, more precisely, one county). The *948 issue presented was the scope of the second Montana exception, that is, “whether, and to what extent, the tribe has a proteetible interest in what activities are taking place on fee land within the reservation and, if it has such an interest, how it may be protected.” 492 U.S. at 430, 109 S.Ct. at 3008 (emphasis added). The tribal zoning ordinance applied to all lands located within the reservation, part of which was located in Yakima County. The county zoning ordinance applied to all lands located within the county, except for tribal trust lands. Most of the reservation was tribal trust land, referred to as the “closed area”; the rest was fee land located through out the reservation in a checkerboard pattern but mostly in one part of the reservation, referred to as the “open area.” The county had approved two proposed developments, one in the open area and one in the closed area, on fee lands owned by nonmembers of the tribe, that conflicted with the tribal zoning ordinance. The tribe sued to stop the proposed development and challenged the county’s zoning authority over the reservation.
The judgment of the Court was divided. The Court, in an opinion by Justice White, upheld application of the county zoning ordinance to the fee land located within the open area, under both the treaty language, id. at 422-25, 109 S.Ct. at 3003-05, and the Montana inherent tribal sovereignty analysis. Id. at 425-32, 109 S.Ct. at 3005-09. However, the Court, in an opinion by Justice Stevens, upheld application of the tribal zoning ordinance to the fee land located within the closed area. Id. at 433-47, 109 S.Ct. at 3009-17 (differentiating between “essential character” of closed and open areas and noting open area was at least half-owned by nonmembers, had lost its character as an exclusive tribal resource, and, as practical matter, had become integrated part of county that is not economically or culturally delimited by reservation boundaries). Although the opinions reach different decisions for different reasons, it is important to note that the regulatory dispute involved the authority to control development of fee lands and not land owned by the tribe or held in trust for the tribe. Cf. United States ex rel. Morongo Band of Mission Indians v. Rose, 34 F.3d 901, 906 (9th Cir.1994) (Montana exceptions are “relevant only after the court concludes that there has been a general divestiture of tribal authority over non-Indians by alienation of the land”). Justice Blackmun would have upheld the tribe’s exclusive authority to zone reservation land, including fee lands, and thus concurred in part and dissented in part. Id. 492 U.S. at 448-68, 109 S.Ct. at 3017-27.
In Bourland the competing regulatory authorities were once again the tribe and the state. At issue were not fee lands, however, but former trust and fee lands that had been taken by the United States for construction of a dam and reservoir for flood control. The taking authorization also “opened” the taken land for recreational use, including hunting and fishing, by the public at large. As in Montana, the tribe sought to regulate hunting and fishing by non-members on the reservation, including the land taken for the flood control project. The state filed suit to enjoin the tribe from excluding non-Indians from hunting and fishing on the taken lands within the reservation. The Court, in an opinion by Justice Thomas, held that Congress, in enacting the flood control legislation, had abrogated the tribe’s right under the relevant treaty to exclude non-Indians from the taken lands. 508 U.S. at 687-89, 113 S.Ct. at 2316. The Court also held that inherent tribal sovereignty did not enable the tribe to regulate non-Indian hunting and fishing in the taken area in the absence of any evidence in the relevant treaties or statutes that Congress intended to allow the tribe to assert such regulatory jurisdiction. Id. at 693-97, 113 S.Ct. at 2319-20. The Court, however, remanded the case for further consideration of whether the tribe retained the inherent sovereignty to regulate non-Indian hunting and fishing in the taken area under the two Montana exceptions. Id. at 695-97, 113 S.Ct. at 2320. Justice Blackmun dissented and would have held that the tribe had the authority to regulate non-Indian hunting and fishing in the taken area because the relevant statutes did not affirmatively abrogate either the tribe’s treaty rights or inherent tribal sovereignty. Id. at 700-04, 113 S.Ct. at 2323-24.
*949 EXHAUSTION OF TRIBAL REMEDIES
Next, National Farmers Union Insurance Cos. v. Crow Tribe, 471 U.S. 845, 105 S.Ct. 2447, 85 L.Ed.2d 818 (1985) (National Farmers Union), and Iowa Mutual do not establish only a rule of exhaustion requiring tribal courts to determine their jurisdiction in the first instance. The rule of exhaustion established in National Farmers Union is premised upon the Court’s decision that tribal civil jurisdiction over non-Indians is not automatically foreclosed by Oliphant v. Suquamish Indian Tribe, 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978) (holding federal legislation conferring jurisdiction on federal courts to try non-Indians for offenses committed in Indian country had implicitly pre-empted tribal criminal jurisdiction over non-Indians). National Farmers Union recognized that an exhaustion requirement would have been superfluous if there were no possibility of tribal civil jurisdiction over non-Indians. 471 U.S. at 854, 105 S.Ct. at 2452-53 (because if Oli-phant applied, federal courts would always be the only forums for civil actions against non-Indians). National Farmers Union thus did not foreclose tribal court jurisdiction over a civil dispute involving a non-Indian defendant. Id. at 855, 105 S.Ct. at 2453 (school district defendant). Iowa Mutual not only reaffirmed the rule of exhaustion established in National Farmers Union but also expressly stated that “[tjribal authority over the activities of non-Indians on reservation lands is an important part of tribal sovereignty” and that “[cjivil jurisdiction over such activities presumptively lies in the tribal courts unless affirmatively limited by a specific treaty provision or federal statute.” 480 U.S. at 18, 107 S.Ct. at 977-78; see Brendale, 492 U.S. at 454-55 n. 5, 109 S.Ct. at 3020-21 n. 5 (Blackmun, J., concurring in part and dissenting in part). This is an affirmative recognition that tribal court civil jurisdiction over reservation-based tort actions against non-Indians is part of inherent tribal sovereignty. Otherwise, there would be no point in requiring exhaustion of tribal remedies to permit the tribal courts to evaluate the factual and legal bases of any challenges to their jurisdiction because the tribal courts would never have jurisdiction.
HANDBOOK OF FEDERAL INDIAN LAW
The landmark treatise does not definitively resolve this issue. As noted by the majority opinion, Felix S. Cohen’s Handbook of Federal Indian Law 342-43 (1982 ed.) does state that “[tjribal courts probably lack jurisdiction over civil eases involving only non-Indians in most situations, since it would be difficult to establish any direct impact on Indians or their property.” However, another section of the Handbook supports tribal civil jurisdiction over non-Indians:
Indian tribes retain civil regulatory and judicial jurisdiction over non-Indians. The extent of tribal civil jurisdiction over non-Indians, however, is not fully determined.
Analysis of the actions of each of the three federal branches demonstrates that civil jurisdiction over non-Indians has not been withdrawn and that the exercise of such jurisdiction is consistent with the tribes’ dependent status under federal law.... In the civil field [contrary to the rule in criminal matters], Congress has never enacted general legislation to supply a federal or state forum for disputes between Indians and non-Indians in Indian country. Furthermore, although treaties between the federal government and Indian tribes sometimes required tribes to surrender non-Indian criminal offenders to state or federal authorities, Indian treaties did not contain provision for tribal relinquishment of civil jurisdiction over non-Indians. Congress’ failure to regulate civil jurisdiction in Indian country suggests both that there was no jurisdictional vacuum to fill and that Congress was less concerned with tribal civil, non-penal jurisdiction over non-Indians than with tribal jurisdiction over the personal liberty of non-Indians.
The executive branch of the federal government has long acted on the assumption that Indian tribes may subject non-Indians to civil jurisdiction. Although the Attorney General and the Solicitor of the Department of the Interior have opined since 1834 that Indian tribes lack criminal jurisdiction over non-Indians, several opinions have upheld tribal civil jurisdiction. The
*950 Attorney General sustained tribal civil jurisdiction in 1855. A comprehensive 1934 Opinion of the Solicitor of the Department of the Interior concluded that “over all the lands of the reservation, whether owned by the tribe, by members thereof, or by outsiders, the tribe has the sovereign power of determining the conditions upon which persons shall be permitted to enter its domain, to reside therein, and to do business.” ...
The breadth of [the tribes’] retained power over non-Indians in civil matters has not been finally resolved....
A tribe presumptively has an interest in activities on lands belonging to the tribe or its members, so tribal control over Indian trust land can be the basis for extensive tribal jurisdiction over non-Indians in civil matters. Regardless of land ownership, tribal jurisdiction within reservations can also be based on transactions between non-Indians and Indians or tribes or on non-Indian activities that directly affect Indians or their property.
Id. at 253-57 (footnotes omitted). Neither excerpt definitively resolves the issue of tribal court jurisdiction over a civil suit brought against a non-Indian arising from a tort occurring on the reservation.
STATE COURT JURISDICTION
The possibility of state court jurisdiction does not preclude tribal court jurisdiction. See Hinshaw v. Mahler, 42 F.3d at 1180 (concurrent state and tribal jurisdiction over certain civil matters occurring on Flathead Reservation, including operation of motor vehicles on public roads), citing Larrivee v. Morigeau, 184 Mont. 187, 602 P.2d 563, 566-71 (1979) (same), cert. denied, 445 U.S. 964, 100 S.Ct. 1653, 64 L.Ed.2d 240 (1980). However, tribal court jurisdiction may preclude state court jurisdiction, particularly where the tribe has established tribal courts and adopted a tribal code which provides for personal jurisdiction over non-Indians, subject matter jurisdiction over torts arising on the reservation, and application of tribal law. This is particularly true if one views the issue in terms of a state’s attempt to assert its civil authority over the conduct of non-Indians on the reservation, which is usually denied, see, e.g., Williams v. Lee, 358 U.S. 217, 79 S.Ct. 269, as opposed to a tribe’s attempt to assert its civil authority over the conduct of non-Indians on the reservation, which is usually upheld. See, e.g., City of Timber Lake v. Cheyenne River Sioux Tribe, 10 F.3d 554, 558 (8th Cir.1993) (reserving inherent tribal sovereignty issue), cert. denied, — U.S. -, 114 S.Ct. 2741, 129 L.Ed.2d 861 (1994). For example, in the landmark case of Williams v. Lee the Court held that the state court did not have jurisdiction over an action brought by a non-Indian who operated a general store on a reservation to recover money for goods sold to Indians because “the exercise of state jurisdiction [under the circumstances] would undermine the authority of the tribal courts over Reservation affairs and hence would infringe on the right of the Indians to govern themselves.” 358 U.S. at 223, 79 S.Ct. at 272; cf. Cowan v. Rosebud Sioux Tribe, 404 F.Supp. 1338, 1341 (D.S.D.1975) (upholding tribal court jurisdiction over tribe’s suit against non-Indian lessee of tribal land).
TRIBAL SELF-GOVERNMENT
Finally, even assuming for purposes of analysis that Montana is not limited to disputes involving fee lands, a “consensual relationship” existed between A-l and Stockert and the tribe by virtue of the subcontract within the meaning of the first Montana exception. In addition, the allegedly tortious conduct of A-l and Stockert occurred on a state highway right-of-way on the reservation. This conduct by non-Indians within the reservation threatened the tribe’s interest in the safe operation of motor vehicles on the roads and highways on the reservation. See Hinshaw v. Mahler, 42 F.3d at 1180; cf. Sage v. Lodge Grass School District No. 27, 13 Indian L.Rep. 6035, 6039 (Crow Ct.App. 1986) (remand following National Farmers Union; student hit by motorcycle on school parking lot; tribe has legitimate interest in protecting health and safety of school children attending school within reservation). The tribe also has an interest in affording those who have been injured on the reservation with a judicial forum. This interest is *951 admittedly abstract compared to the safe operation of motor vehicles. However, disregarding the jurisdiction of tribal courts, which play a vital role in tribal self-government, undermines their authority over reservation affairs and to that extent imperils the political integrity of the tribe.
For these reasons, I would affirm the order of the district court holding the tribal court has subject matter jurisdiction over this reservation-based tort action between non-tribal members.

. Rights-of-way are part of “Indian country” as defined by federal law. 18 U.S.C. § 1151 (“Indian country” includes "all land within the limits of any reservation under the jurisdiction of the United States government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation”). “While [18 U.S.C.] § 1151 is concerned, on its face, only with criminal jurisdiction, the [Supreme] Court has recognized that it generally applies as well to questions of civil jurisdiction.” DeCoteau v. District County Court, 420 U.S. 425, 427 n. 2, 95 S.Ct. 1082, 1085 n. 2, 43 L.Ed.2d 300 (1975).