_____

No. 92-3359
_____

A-1 Contractors; Lyle Stockert, *
                                *
        Appellants,             *
                                *
    v.                          *
                                *
Honorable William Strate,       *   Appeal from the United States
Associate Tribal Judge of the   *   District Court for the
Tribal Court of the Three       *   District of North Dakota.
Affiliated Tribes of the Fort   *
Berthold Indian Reservation;    *
Three Affiliated Tribes of the  *
Fort Berthold Indian            *
Reservation, The Tribal Court;  *
Lyndon Benedict Fredericks;     *
Kenneth Lee Fredericks; Paul    *
Jonas Fredericks; Hans          *
Christian Fredericks; Jeb Pius  *
Fredericks; Gisela Fredericks,  *
                                *
        Appellees.              *


_____

Submitted:  May 23, 1995

Filed:  February 16, 1996
_____

Before RICHARD S. ARNOLD, Chief Judge, FLOYD R. GIBSON, McMILLIAN,
FAGG, BOWMAN, WOLLMAN, MAGILL, BEAM, LOKEN, HANSEN, MORRIS SHEPPARD
ARNOLD, and MURPHY, Circuit Judges, en banc.
_____

HANSEN, Circuit Judge.

    In this case, we are asked to decide whether an American
Indian Tribal Court has subject matter jurisdiction over a tort
case which arose out of an automobile accident which occurred
between two non-Indian parties on an Indian reservation.  A divided

panel of this court previously concluded that the Indian tribe retained the inherent sovereign power to allow the tribal court to exercise subject matter jurisdiction over the dispute. After granting the suggestion of A-1 Contractors and Lyle Stockert to rehear this case en banc, we vacated the panel opinion. We now hold that the tribal court does not have subject matter jurisdiction over the dispute.

I.

On November 9, 1990, on a state highway on the Fort Berthold Indian Reservation in west-central North Dakota, a gravel truck owned by A-1 Contractors and driven by Lyle Stockert (an A-1 employee) and a small car driven by Gisela Fredericks collided. Mrs. Fredericks suffered serious injuries and was hospitalized for 24 days. A-1 is a non-tribal company located in Dickinson, North Dakota. Stockert is not a member of the tribe and resides in Dickinson, North Dakota. Mrs. Fredericks is not a member of the tribe; however, she resides on the reservation, she was married to a tribal member (now deceased), and her adult children are enrolled members of the tribe.

At the time of the accident, A-1 was working on the reservation under a subcontract agreement with LCM Corporation, a corporation wholly owned by the tribe. Under the subcontract, A-1 performed excavating, berming, and recompacting work in connection with the construction of a tribal community building. A-1 performed all of the work under the subcontract within the boundaries of the reservation. The record is not clear whether Stockert was engaged in work under the contract at the time of the accident.[1]

_____

[1]There is no proof (as opposed to allegations) that we can find in the record to support the district court's finding of fact that A-1 was in performance of the contract at the time of the accident. The district court made its fact-findings based on

2

In May 1991, Mrs. Fredericks sued A-1, Stockert, and Continental Western Insurance Company (A-1's insurer), in the Tribal Court for the Three Affiliated Tribes[2] of the Fort Berthold Indian Reservation. Mrs. Fredericks' adult children also filed loss of consortium claims as part of the suit. Mrs. Fredericks and her adult children sought damages in excess of $13 million for personal injury, loss of consortium, and medical expenses.

A-1, Stockert, and Continental Western made a special appearance in tribal court and moved to dismiss the Fredrickses' suit, contending that the tribal court lacked personal and subject matter jurisdiction. The tribal court denied the motion and found that it had personal and subject matter jurisdiction over the suit brought by Gisela Fredericks. Fredericks v. Continental Western Ins. Co., No. 5-91-A04-150, slip op at 1.24(d) (Fort Berthold Tribal Ct. Sept. 4, 1991). Specifically, the tribal court found that it had personal jurisdiction over the parties based on Chapter 1, section 3 of the Tribal Code because Mrs. Fredericks is a resident of the reservation and because A-1 had "entered and transacted business within the territorial boundaries of the Reservation." Id. at 1.24(c). The tribal court also concluded that it had subject matter jurisdiction over the action because its inherent tribal sovereignty had not been limited by treaty or federal statute. See id. at 1.24(d). Given the tribal court's conclusion that it had jurisdiction over the claims of Gisela Fredericks, the tribal court did not reach the question of its jurisdiction over the consortium claims brought by her children, who were tribal members.

_____

the pleadings in this case, not upon the evidence.

[2]The Three Affiliated Tribes -- Mandan, Hidatsa, and Arikara -- are federally recognized Indian tribes which exercise their sovereignty under a federally approved constitution adopted pursuant to the Indian Reorganization Act of 1934, 25 U.S.C. §§ 461-479.

A-1, Stockert, and Continental Western appealed to the Northern Plains Intertribal Court of Appeals. The Intertribal Court of Appeals affirmed the tribal court and remanded the case to the tribal court for further proceedings. <u>Fredericks v. Continental Western Ins. Co.</u>, Northern Plains Intertribal Ct. App. (Jan. 8, 1992). The Intertribal Court of Appeals took a broad view of the tribe's civil authority over the non-Indians involved in this dispute:

> Like any sovereign, Three Affiliated Tribes has [sic] an interest in providing a forum for peacefully resolving disputes that arise in their geographic jurisdiction and protecting the rights of those who are injured within such jurisdiction.

Slip op. at 7. Continental Western was dismissed from the case without prejudice pursuant to an agreement of the parties.

Before proceedings resumed in the tribal trial court, A-1 and Stockert filed this case in the United States District Court for the District of North Dakota against Mrs. Fredericks and her children (hereinafter "the Frederickses"), the Honorable William Strate, Associate Tribal Judge for the Tribal Court of the Three Affiliated Tribes of the Fort Berthold Indian Reservation, and the tribal court itself. A-1 and Stockert sought injunctive and declaratory relief. They asked the district court to declare that the tribal court had no jurisdiction over this matter, to enjoin the Frederickses from proceeding against them in the tribal court, and to enjoin the tribal judge and the tribal court (hereinafter the "tribal defendants") from asserting jurisdiction over them.

The tribal defendants initially raised the affirmative defense of sovereign immunity, but subsequently consented to the suit for the limited purpose of defending the federal law claims for injunctive relief. Both sides filed motions for summary judgment on the issue of tribal court jurisdiction. The district court

4

denied the summary judgment motion of A-1 and Stockert, and it granted the summary judgment motions of the Frederickses and the tribal defendants. A-1 Contractors v. Strate, Civil No. A1-92-94 (D.N.D. Sept. 17, 1992). The district court decided that the only factual dispute was whether Mrs. Fredericks resided on or off the reservation, which was irrelevant to the issue of tribal court jurisdiction. Id. at 4-5. The district court then decided that the tribal court had both personal and subject matter jurisdiction, and concluded that Indian tribes have retained inherent sovereignty to exercise jurisdiction over civil causes of action between non-Indians that arise on the reservation unless specifically limited by treaty or federal statute. Id. at 9-10. The district court found that there was no treaty or statute that limited the tribe's jurisdiction in this case. Id. at 10. A-1 and Stockert appealed on the issue of subject matter jurisdiction over the claims of Mrs. Fredericks.[3]

A panel of this court affirmed the district court in a two-to-one decision. A-1 Contractors v. Strate, No. 92-3359, 1994 WL 666051 (8th Cir. Nov. 29, 1994). A-1 and Stockert requested review of the panel's decision en banc. We granted their request, vacated the panel opinion, and set this case for rehearing en banc.

II.

We review de novo the district court's decision both granting and denying summary judgment. Get Away Club, Inc. v. Coleman, 969 F.2d 664, 666 (8th Cir. 1992). We agree with the district court that this case presents no relevant factual disputes for our review. The only question presented, whether the tribal court has jurisdiction over this dispute, is a question of law. FMC v.

---

[3]The consortium claims of Mrs. Fredericks' adult children are not a part of this appeal because neither the tribal courts nor the federal district court addressed the tribal courts' jurisdiction over those claims.

5

Shoshone-Bannock Tribes, 905 F.2d 1311, 1313-14 (9th Cir. 1990), cert. denied, 499 U.S. 943 (1991).

The specific question presented for our resolution is whether the tribal court has civil jurisdiction over this dispute which arose between two non-Indian parties on the Fort Berthold Reservation. A-1 and Stockert argue that under Supreme Court case law, the tribe does not have the inherent sovereign authority to exercise civil jurisdiction over non-Indians unless the dispute implicates an important tribal interest. See, e.g., Montana v. United States, 450 U.S. 544 (1981); South Dakota v. Bourland, 113 S. Ct. 2309, 2320 (1993); Brendale v. Confederated Tribes and Bands of the Yakima Indian Nation, 492 U.S. 408, 426-27 (1989) (plurality). A-1 and Stockert argue that because this case involves no such tribal interest, the district court erred in holding that the tribal court had subject matter jurisdiction over this dispute. The Frederickses and the tribal defendants (collectively "the appellees") argue that a different line of Supreme Court authority governs this issue. The appellees argue that language from this line of cases indicates that the district court correctly concluded that tribal courts have inherent civil jurisdictional authority over all disputes arising on the reservation, regardless of whether the parties involved are tribal members. See, e.g., Iowa Mutual Ins. Co. v. LaPlante, 480 U.S. 9 (1987); National Farmers Union Ins. Cos v. Crow Tribe of Indians, 471 U.S. 845 (1985); Merrion v. Jicarilla Apache Tribe, 455 U.S. 130, 137 (1982); Williams v. Lee, 358 U.S. 317 (1959). The appellees contend that the district court correctly found that the tribe had full geographical/territorial jurisdiction over this dispute. The issue presented for our review is largely unresolved and has generated a great deal of interest and commentary. See, e.g., Allison S. Dussias, Geographically-Based and Membership-Based Views of Indian Tribal Sovereignty: The Supreme Court's Changing Vision, 55 U. Pitt. L. Rev. 1 (1993) (detailing and criticizing the

Supreme Court's increasing emphasis on membership-based sovereignty).

In our view, the standards articulated in <u>Montana v. United States</u>, 450 U.S. 544 (1981), and subsequent cases applying those standards, control the resolution of this dispute. In <u>Montana</u>, the Supreme Court specifically addressed the reach of tribal civil jurisdiction over non-Indian parties and found that:

> the Indian tribes retain their inherent power to determine tribal membership, to regulate domestic relations among members, and to prescribe rules of inheritance for members. But exercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes, and so cannot survive without express congressional delegation.

<u>Id.</u> at 564 (citations omitted). The Court then announced the general principle that "the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe." <u>Id.</u> at 565.[4]

Indian tribes, however, do "retain inherent sovereign authority to exercise <u>some</u> forms of civil jurisdiction over non-Indians on their reservations." <u>Id.</u> (emphasis added). This jurisdiction arises: (1) when nonmembers "enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements" or (2) when a nonmember's "conduct threatens or has some direct effect on the

---

[4]Stated another way: "A tribe's inherent sovereignty . . . is divested to the extent it is inconsistent with the tribe's dependent status, that is, to the extent it involves the tribe's `external relations.'" <u>Brendale</u>, 492 U.S. at 425-26 (plurality) (citing <u>United States v. Wheeler</u>, 435 U.S. 313, 326 (1978)). The tribe's external relations are generally those involving nonmembers of the tribe. <u>See</u> <u>id.</u>

political integrity, the economic security, or the health or welfare of the tribe." Id. at 565-66 (citations omitted). These two situations are the "two exceptions" to Montana's general rule that an Indian tribe does not have inherent sovereign powers over the activities of nonmembers. Bourland, 113 S. Ct. at 2320. In our view, the tribal court in this case would not have subject matter jurisdiction under Montana unless the appellees can establish the existence of a tribal interest under either of the two exceptions.

The Supreme Court has reiterated or reaffirmed the Montana analysis of civil tribal jurisdiction over non-Indians a number of times. Bourland, 113 S. Ct. at 2319 (reasserting the centrality of the observation in Montana that "exercise of tribal power beyond what is necessary to protect tribal self-government or to control internal tribal relations is inconsistent with the dependent status of the tribes, and so cannot survive without express congressional delegation"); County of Yakima v. Confederated Tribes and Bands of Yakima Indian Nation, 502 U.S. 251, 267 (1992) (citing Montana in referring to the "long line of cases exploring the very narrow powers reserved to tribes over the conduct of non-Indians within their reservations"); Duro v. Reina, 495 U.S. 676, 687-88 (1990) (criminal jurisdiction case reciting Montana's observation that "the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe" and that civil tribal jurisdiction over non-Indians on the reservation typically involves situations arising from property ownership within the reservation or the "consensual relationships" outlined in Montana), overruled by statute on other grounds, 25 U.S.C. § 1301(2) & (3); Brendale, 492 U.S. at 426-27 (plurality) (following Montana principles and concluding there was no tribal interest which allowed the tribe to exercise authority over nonmembers on fee lands within the reservation). Perhaps the Court's most emphatic reiteration of these standards is its recent statement that "after Montana, tribal

8

sovereignty over nonmembers `cannot survive without express congressional delegation.'" Bourland, 113 S. Ct. at 2320 n.15.

The appellees argue that instead of applying the Montana analysis, we should resolve this case under the Supreme Court's decisions in Iowa Mutual, National Farmers Union, Williams v. Lee, and Merrion. In our view, none of those cases supports the appellees' contentions that the tribal court has the broad civil subject matter jurisdiction the tribal courts and the district court found in this case. In Iowa Mutual, the Court held only that exhaustion of tribal remedies is required before a federal district court can decide the issue of federal court jurisdiction. 480 U.S. at 18-19; see also Brendale, 492 U.S. at 427 n.10 (the plurality specifically observed that Iowa Mutual only established an exhaustion rule and did not decide whether the tribe had jurisdiction over the nonmembers involved). In reaching its conclusion on the exhaustion requirement, the Court offered the following observation upon which the appellees rely heavily:

> Tribal authority over the activities of non-Indians on reservation lands is an important part of tribal sovereignty. See Montana v. United States, 450 U.S. 544, 565-66 (1981) [other citations omitted]. Civil jurisdiction over such activities presumptively lies in the tribal courts unless affirmatively limited by a specific treaty provision or federal statute.

Iowa Mutual, 480 U.S. at 18. The appellees argue that this language indicates that Indian tribes retain unrestricted territorial civil jurisdiction unless that jurisdiction has been affirmatively limited by treaty or federal statute. The appellees contend that like a state, the tribe retains full sovereignty over all matters arising on the reservation unless and until that jurisdiction is divested by federal law. The appellees further argue that consistent with Iowa Mutual, the tribal court may exercise subject matter jurisdiction in this case because it

9

happened on the reservation and there has been no affirmative divestment of the tribe's authority.

In our view, the appellees' reading of this isolated language from Iowa Mutual is unnecessarily broad and conflicts with the principles of Montana. This language from Iowa Mutual can and should be read more narrowly and in harmony with the principles set forth in Montana, which the Court cites in making those observations. When the Court observes in Iowa Mutual that "[t]ribal authority over the activities of non-Indians on reservation lands is an important part of tribal sovereignty," 480 U.S. at 18, the Court cites Montana and thus is referring to the types of activities, like consensual contractual relationships (the first Montana exception), that give rise to tribal authority over non-Indians under Montana. Likewise, when the Court goes on to say "[c]ivil jurisdiction over such activities presumptively lies in the tribal courts unless affirmatively limited by a specific treaty provision or federal statute," id. (emphasis added), the Court again is referring to a tribe's civil jurisdiction over tribal-based activities that exists under Montana. We recently interpreted the Iowa Mutual case in just such a fashion, stating: "Civil jurisdiction over tribal-related activities on reservations presumptively lies in the tribal courts unless affirmatively limited by a specific treaty provision or by federal statute." Duncan Energy v. Three Affiliated Tribes, 27 F.3d 1294, 1299 (8th Cir. 1994) (emphasis added) (citing Iowa Mutual, 480 U.S. at 18). Hence, Iowa Mutual should not be read to expand the category of activities which Montana described as giving rise to tribal jurisdiction over non-Indians or nonmembers. Instead, we read it within the parameters of Montana.

National Farmers Union, like Iowa Mutual, was an exhaustion case which did not decide whether tribes had jurisdiction over nonmembers. Brendale, 492 U.S. at 427 n.10. Nonetheless, the appellees contend that we should read National Farmers Union as a

10

limitation on the reach of Montana because National Farmers Union limited the reach of Oliphant v. Suquamish Indian Tribe, 435 U.S. 191 (1978), a criminal tribal jurisdiction case upon which Montana relied. In Oliphant, the Court had concluded that tribal courts have no criminal jurisdiction over non-Indians because the tribe did not retain the inherent authority to exercise that type of jurisdiction. 435 U.S. at 208-10. The Court in National Farmers Union stated that "the question whether a tribal court has the power to exercise civil subject-matter jurisdiction over non-Indians in a case of this kind is not automatically foreclosed, as an extension of Oliphant would require." 471 U.S. at 855. The appellees argue that in National Farmers Union the Court refused to extend Oliphant's limitation of inherent sovereign authority to civil cases.

The appellees fail to recognize the fact that Montana specifically extended the general principles underlying Oliphant to civil jurisdiction. Montana, 450 U.S. at 565 ("Though Oliphant only determined inherent tribal authority in criminal matters, the principles on which it relied support the general proposition that the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe") (footnote omitted). Montana did not extend the full Oliphant rationale to the civil jurisdictional question -- which would have completely prohibited civil jurisdiction over nonmembers. Instead, the Court found that the tribe retained some civil jurisdiction over nonmembers, which the Court went on to describe in the Montana exceptions. 450 U.S. at 565-66. Thus, when National Farmers Union states that civil tribal jurisdiction over nonmembers is not foreclosed by Oliphant, that observation is perfectly consistent with Montana, which provides for broader tribal jurisdiction over non-Indians than does Oliphant. Under Montana, the tribe has the ability to exercise civil jurisdiction over non-Indians when tribal interests (as defined in the Montana exceptions) are involved.

11

We also read the other cases the appellees rely upon within the limits of <u>Montana</u>. In <u>Williams</u>, the Court found that the tribal courts had jurisdiction over a suit by a non-Indian store owner on the reservation against two members of the tribe for breach of contract based on a transaction that occurred on the reservation. 358 U.S. at 218, 223. This factual situation fits squarely under the "consensual agreement" test for jurisdiction in <u>Montana</u> (the first <u>Montana</u> exception). In fact, <u>Montana</u> specifically cited <u>Williams</u> in creating the two exceptions that allow for civil jurisdiction over non-Indians. 450 U.S. at 544-45.

Similarly, the appellees read too much into language from <u>Merrion</u>, where the Court stated in a footnote: "Because the Tribe retains all inherent attributes of sovereignty that have not been divested by the Federal Government, the proper inference from silence . . . is that the sovereign power . . . remains intact." 455 U.S. at 149 n.14. The Court made the observation in isolation in a case dealing with the tribe's authority to impose a severance tax on non-Indians on the reservation. The Court found this taxation power was derived either from the tribe's inherent power of self-government or the power to exclude, <u>id.</u> at 149, both of which are consistent with the inherent powers the tribe retains over nonmembers described in <u>Montana</u>. Both <u>Merrion</u> and <u>Iowa Mutual</u> say essentially the same thing: the inherent attributes of sovereignty that an Indian tribe retains, which under <u>Montana</u> are very limited when dealing with non-Indians, remain intact unless affirmatively limited by the federal government.

The appellees argue that <u>Montana</u> and <u>Brendale</u> apply only to a tribe's ability to exercise authority over non-Indians' activities on non-Indian fee lands -- i.e., plots of land owned by non-Indians in fee simple that happen to be located within the exterior boundaries of the reservation. In our view, the appellees place an artificial limitation on those cases. While <u>Montana</u> and <u>Brendale</u> address questions of tribal authority over non-Indians on non-

12

Indian owned fee lands, neither case limits its discussion or rationale to jurisdictional issues arising on fee lands. To the contrary, the Montana Court found, without any qualification whatsoever, that tribal power may not reach beyond what is necessary to protect tribal self-government or to control internal relations absent express congressional delegation. 450 U.S. at 564. Montana also specifically addressed the "forms of civil jurisdiction over non-Indians on their reservations" and provided the two limited situations in which that jurisdiction may arise. Id. at 565 (emphasis added). Thus, Montana explicitly addressed the authority of tribes to exercise civil jurisdiction on the reservation, as well as on non-Indian fee lands. The Brendale plurality noted that Montana involved regulation of fee lands, but it did not specifically limit the Montana rationale to fee land disputes. See Brendale, 492 U.S. at 426-27. Since Brendale, the Supreme Court likewise has not seen fit to limit either Montana or Brendale in the fashion the appellees have suggested. Instead, the Court has discussed these cases and their observations about tribal jurisdiction in broad and unqualified language. See Bourland, 113 S. Ct. at 2319; County of Yakima, 502 U.S. at 267; Duro, 495 U.S. at 687.

Moreover, a number of cases analyzing civil jurisdictional issues in non-fee land disputes have relied upon or cited Montana. See Stock West Corp. v. Taylor, 964 F.2d 912, 918-19 (9th Cir. 1992) (en banc) (quoting Montana test in non-fee land jurisdictional dispute); FMC, 905 F.2d at 1314 (citing Montana in non-fee land case as "the leading case on tribal civil jurisdiction over non-Indians"); see also Tamiami Partners Ltd. v. Miccosukee Tribe of Indians of Florida, 999 F.2d 503, 508 n.11 (11th Cir. 1993) (citing Montana in recognizing that tribal courts have power to exercise civil jurisdiction in conflicts affecting the interests of Indians on Indian lands). Thus, we conclude that any attempt to limit the rationale of Montana and Brendale to fee land

13

jurisdictional issues is both uncompelling and unsupported by the language of those two cases.

The appellees next argue that we should read the Montana line of cases as addressing tribal regulatory power over non-Indians and the line of cases represented by Iowa Mutual as addressing tribal adjudicatory power over non-Indians. They contend that Iowa Mutual and related cases would control in this case, which is a dispute about tribal adjudicatory power. The appellees assert that drawing such a distinction would be the best way to resolve what they see as the apparent contradiction between the language from those differing lines of cases.

Again, we must disagree. While the distinction the appellees propose appears in some commentaries, see, e.g., Dussias, 55 U. Pitt. L. Rev. at 43-78, the distinction does not appear explicitly, or even implicitly, anywhere in the case law. Montana and the cases following Montana have dealt with questions of civil tribal regulatory jurisdiction, but those cases have never suggested that their reasoning is limited solely to regulatory matters. Quite the contrary, as we have noted above, those cases have spoken about civil jurisdiction in broad and unqualified terms without any limitation of the discussion to particular aspects of civil jurisdiction. Likewise, Iowa Mutual and the other cases the appellees rely on have never suggested such a distinction. In fact, in Iowa Mutual, the Court cites Montana without any indication that Montana should be limited to regulatory jurisdiction. Iowa Mutual, 480 U.S. at 18.

Moreover, any attempt to create or apply a distinction between regulatory jurisdiction and adjudicatory jurisdiction in this case would be illusory. If the tribal court tried this suit, it essentially would be acting in both an adjudicatory capacity and a regulatory capacity. At oral argument, all of the parties agreed that if the tribal court tried this case, it would have the power

to decide what substantive law applies.  Essentially, the tribal court would define the legal relationship and the respective duties of the parties on reservation roads and highways.  Thus, while adjudicating the dispute, the tribal court also would be regulating the legal conduct of drivers on the roads and highways that traverse the reservation.  Accordingly, we see no basis in this case for applying the regulatory-adjudicatory distinction the appellees have proposed.

Furthermore, even if we applied a regulatory-adjudicatory distinction, it would not change our conclusion.  None of the cases, including those that the appellees argue are "adjudicatory jurisdiction" cases, have ever addressed the issue presented here -- a tribal court's civil jurisdiction over an accident involving non-Indian parties.  As we have demonstrated above, all of the appellees' proposed "adjudicatory" cases are consistent with the Montana case.  Even if we were to treat Montana as a "regulatory" authority case, we see no reason not to apply its principles to this open question of inherent authority to exercise civil adjudicatory jurisdiction over this dispute.  Thus, we see no valid basis for distinguishing or limiting Montana, as the appellees suggest.

Arguably, some of the language from Iowa Mutual, Williams, and Merrion can be viewed in isolation to create tension with Montana. A careful reading of the particular language of those cases, however, indicates that they can and should be read together with Montana to establish one comprehensive and integrated rule: a valid tribal interest must be at issue before a tribal court may exercise civil jurisdiction over a non-Indian or nonmember, but once the tribal interest is established, a presumption arises that tribal courts have jurisdiction over the non-Indian or nonmember unless that jurisdiction is affirmatively limited by federal law.  This rule is supported by the above authority and by the leading treatise on American Indian law, which specifically states: "Tribal

15

courts probably lack jurisdiction over civil cases involving only non-Indians in most situations, since it would be difficult to establish any direct impact on Indians or their property." <u>Felix S. Cohen's Handbook of Federal Indian Law</u>, 342-43 (1982 ed.). This well-accepted rule controls this case.

Finally, the appellees urge us to follow a recent decision in a case factually very similar to this case, where the Ninth Circuit held that the tribal court had jurisdiction over the lawsuit. <u>See Hinshaw v. Mahler</u>, 42 F.3d 1178 (9th Cir. 1994). In <u>Hinshaw</u>, Christian Mahler died from injuries he received when a car driven by Lynette Hinshaw collided with the motorcycle Mahler was riding on a U.S. highway within the boundaries of the Flathead Indian Reservation. Both Mahler and Hinshaw were residents of the reservation, but they were not members of the tribe. <u>Id.</u> at 1180. Mahler's mother (an enrolled member of the tribe) and Mahler's father (a nonmember) brought wrongful death and survivorship actions in the tribal court. Hinshaw challenged the tribal court's personal and subject matter jurisdiction in federal district court. The Ninth Circuit affirmed the district court's conclusion that the tribal court had jurisdiction over those claims. <u>Id.</u> at 1180-81. To the extent that <u>Hinshaw</u> supports the appellees' arguments that tribal courts have jurisdiction over a tort claim arising between two non-Indians on a highway running through an Indian reservation, we respectfully decline to follow it. Such a broad interpretation of civil tribal jurisdiction is, we believe, inconsistent with <u>Montana</u>.

The authority is quite clear that the kind of sovereignty the American Indian tribes retain is a <u>limited</u> sovereignty, and thus the exercise of authority over nonmembers of the tribe "is necessarily inconsistent with a tribe's dependent status." <u>Brendale</u>, 492 U.S. at 427 (citing <u>United States v. Wheeler</u>, 435 U.S. 313, 326 (1978)). Stated another way, "the inherent sovereign powers do not extend to the activities of nonmembers of the tribe."

16

*Montana*, 450 U.S. at 565, quoted in *Duro v. Reina*, 495 U.S. at 687. As such, we cannot endorse the appellees' concept of plenary tribal territorial (or geographical) civil jurisdiction. Such a concept presents an overly broad interpretation of the tribe's sovereignty which is inconsistent with the tribe's dependent status and is contrary to *Montana*. Thus, for the tribe to exercise civil jurisdiction over nonmembers, the *Montana* exceptions must be satisfied because the "inherent attributes of sovereignty" do not extend to nonmembers.

While the tribe's inherent authority to assert civil jurisdiction over a nonmember depends on the existence of a tribal interest as defined in *Montana*, that does not mean geography plays no role in the sovereignty and jurisdictional inquiry. "The Court has repeatedly emphasized that there is a significant geographical component to tribal sovereignty." *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 151 (1980). In *Montana*, the Court accounted for this geographical component of the jurisdictional analysis when it stated that "Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands." 450 U.S. at 565 (emphasis added). *Montana* implicitly recognizes that without the geographic connection to Indian country, the tribes would have no plausible grounds for asserting jurisdiction over the non-Indian parties. Thus, properly understood, the geographical component of the jurisdictional analysis is important but not dispositive. See generally *Bracker*, 448 U.S. at 151 (geographical component of tribal sovereignty is important -- though not dispositive factor for courts to weigh in determining whether a state's authority to tax non-Indians for activities on reservation has been pre-empted).

17

III.

Applying <u>Montana</u> to this case, there must be a tribal interest at issue (as defined in the <u>Montana</u> exceptions) before the tribal court can exercise jurisdiction over the non-Indian parties.  We conclude that no such tribal interest exists in this case.  This dispute arose between two non-Indians involved in an ordinary run-of-the-mill automobile accident that occurred on a North Dakota state highway traversing the reservation.  Those facts, which stand alone in this case, make this dispute distinctively non-tribal in nature.

The appellees argue that the "consensual relationship" test (the first <u>Montana</u> exception) is satisfied because A-1 voluntarily entered into a subcontract with the tribe and Lyle Stockert was an A-1 employee who was allegedly on the reservation pursuant to that subcontract when he was involved in the accident with Gisela Fredericks.  In our view, that reasoning is flawed.  The dispute in this case is a simple personal injury tort claim arising from an automobile accident, not a dispute arising under the terms of, out of, or within the ambit of the "consensual agreement," i.e., the subcontract between the tribes and A-1.  Gisela Fredericks was not a party to the subcontract, and the tribes were strangers to the accident.[5]

The appellees also argue that the second <u>Montana</u> exception is satisfied because the dispute arose on the reservation, and therefore, the conduct in dispute here necessarily affects the tribe's political integrity, economic security, or health or

_____

[5]A-1 and Stockert have noted that under the terms of the subcontract involved in this case, all disputes arising out of the subcontract would be determined under Utah law and would be heard in the Utah courts.  The appellees have not argued to the contrary.  However, we will not give this fact any controlling weight because the subcontract is not part of this record.

18

welfare.  The appellees contend that the dispute affects the tribe's political integrity because it deals with the tribe's ability to function as a fully sovereign government.  We disagree. In our view, this case has nothing to do with the Indian tribe's ability to govern its own affairs under tribal laws and customs. It deals only with the conduct of non-Indians and the tribe's asserted ability to exercise plenary judicial authority over a decidedly non-tribal matter.  The only governmental interest the tribe alleges is the right to act as a full sovereign to exercise full sovereign authority over events that happen within its geographical boundaries.  As noted above, tribes are limited sovereigns and do not possess full sovereign powers.  Thus, this desire to assert and protect excessively claimed sovereignty is not a satisfactory tribal interest within the meaning of the second Montana exception.

The appellees also argue that even though Mrs. Fredericks is a non-Indian and nonmember of the tribe, she is a long-time resident of the reservation and hence is an imbedded member of the community with a recognizable social and economic value to the tribal community.  Thus, they argue that it is critical to provide her a tribal forum for her disputes.  The simple fact that Mrs. Fredericks is a resident of the reservation, however, does not satisfy the second Montana exception.  It is not essential to the tribe's political integrity, economic security, or health or welfare to provide her, a non-Indian and nonmember, with a judicial forum for resolution of her disputes.  A forum is available to Mrs. Fredericks in the North Dakota state courts, and there is no indication that she would be prevented from asserting her claims, in full, in that forum.[6]

---

[6]There has been some discussion of the effect of 28 U.S.C. § 1360 on jurisdiction of the North Dakota state courts.  That section, by its very terms, applies only to the state court's jurisdiction over actions to which Indians are parties.  See also 25 U.S.C. § 1322 (similar jurisdictional provision of Indian

Likewise, the fact that Mrs. Fredericks wants to bring her suit in the tribal courts does not control. Montana very clearly states that the conduct giving rise to the case must threaten or have a "direct effect on the political integrity, economic security, or health or welfare of the tribe," not the nonmember, before the tribe can assert civil jurisdiction over nonmembers. 450 U.S. at 466 (emphasis added). Nor is it persuasive to us that Mrs. Fredericks may be as close to being a member of the tribe as she could be without actually being a member. Montana is very clear that tribal membership is of critical importance. Mrs. Fredericks is neither an Indian nor a member of the tribe. The fact that Mrs. Fredericks has not been admitted to membership in the tribe places her outside the reach of the tribe's inherent authority, absent some separate showing of a direct effect on the tribe. In this case, the appellees have completely failed to show that the tribe's ability to govern or protect its own members would be directly damaged if the tribe cannot assert jurisdiction over this lawsuit. Thus, the second exception to Montana does not apply.

IV.

Simply stated, this case is not about a consensual relationship with a tribe or the tribe's ability to govern itself; it is all about the tribe's claimed power to govern non-Indians and nonmembers of the tribe just because they enter the tribe's territory. By remaining within the principled approach of Montana,

---

Civil Rights Act). Because we have found that this case does not involve any Indian parties, those sections simply do not apply to this case. We note that even if applicable, those sections would tend to indicate that the North Dakota state courts have jurisdiction over this case. See Three Affiliated Tribes of the Fort Berthold Reservation v. Wold Engineering, 476 U.S. 877 (1986) (North Dakota's attempt to disclaim unconditional state court jurisdiction over civil claims arising in Indian country held invalid).

20

the tribe retains the ability to govern itself because the tribal court will have jurisdiction whenever a "tribal interest" in a dispute is established. Under <u>Iowa Mutual</u>, where such a tribal interest exists, the jurisdiction is broad and requires an affirmative change in federal law to limit it in any way. Because we have concluded that no tribal interest as defined in <u>Montana</u> exists in this case, we conclude that the tribe does not retain the inherent sovereign power to exercise subject matter jurisdiction over this dispute through its tribal court. Accordingly, we reverse the judgment of the district court.

BEAM, Circuit Judge, with whom FLOYD R. GIBSON, McMILLIAN, and MURPHY, Circuit Judges, join, concurring and dissenting.

I concur in the court's "comprehensive and integrated" rule that "a valid tribal interest must be at issue before a tribal court may exercise civil jurisdiction over a non-Indian or nonmember, but once the tribal interest is established, a presumption arises that tribal courts have jurisdiction over the non-Indian or nonmember unless that jurisdiction is affirmatively limited by federal law." <u>Supra</u> at 15-16. I dissent, however, from the court's application of the rule in this case and from the implication that a tribal court has no jurisdiction in a civil case unless the dispute involves an Indian or a member of the tribe.

The concept of "tribal interest" as advanced by the court appears to be a free-floating theory wholly detached from geographic reality except in a most attenuated way. I dissent from this ideation of tribal jurisdiction because it is contrary to <u>Brendale v. Confederated Tribes & Bands of the Yakima Indian Nation</u>, 492 U.S. 408 (1989); <u>Iowa Mut. Ins. Co. v. LaPlante</u>, 480 U.S. 9 (1987); <u>National Farmers Union Ins. Co. v. Crow Tribe of Indians</u>, 471 U.S. 845 (1985) and other earlier cases, to say nothing of <u>Montana v. United States</u>, 450 U.S. 544 (1981), the case most heavily relied upon by the court.

21

A legitimate judicial system arises as an attribute of sovereignty. Indeed, "the existence and extent of a tribal court's jurisdiction . . . require[s] a careful examination of tribal sovereignty." National Farmers Union, 471 U.S. at 855. Accordingly, any determination of tribal court jurisdiction requires examination of the parts and pieces of tribal sovereignty and how they fit within the jurisdictional equation.

Historically, the connection of Indians to the land has shaped the course of Indian law. In the landmark case of Worcester v. Georgia, 31 U.S. (6 Pet.) 515, 557 (1832), Indian nations were recognized as "distinct political communities, having territorial boundaries, within which their authority is exclusive, and having a right to all the lands within those boundaries, which is not only acknowledged, but guaranteed by the United States." In Williams v. Lee, 358 U.S. 217 (1959), the Court recognized the importance of Indian land when it decided the question of jurisdiction over a case brought in state court by a non-Indian merchant against Indian customers. Holding that the case should have been brought in tribal court, the Court stated "[i]t is immaterial that respondent is not an Indian. He was on the Reservation and the transaction with an Indian took place there." Id. at 223.

Even in more recent cases the Court has recognized the significance of geography to tribal sovereignty. In U.S. v. Mazurie, 419 U.S. 544, 557 (1975), the Court noted that its cases had consistently recognized that the Indian tribes retain "attributes of sovereignty over both their members and their territory." (Emphasis added.) Merrion v. Jicarilla Apache Tribe, 455 U.S. 130 (1982), explores a tribe's historic power to exclude others from tribal lands.

Brendale supports a rule which would allow a court to consider Indian territory in determining the tribe's interest in a given case. The plurality in Brendale suggests a case-by-case approach

22

to deciding whether <u>Montana</u>'s second exception confers tribal
jurisdiction.  The precise wording of the second exception, the
plurality writes, indicates that "a tribe's authority need not
extend to all conduct that `threatens or has some direct effect on
the political integrity, the economic security, or the health or
welfare of the tribe,' but instead depends on the circumstances."
<u>Brendale</u>, 492 U.S. at 429.  Thus, <u>Brendale</u> suggests that the
meaning of <u>Montana</u>'s second exception is not static but depends on
various factors.

All of these cases further suggest that geography plays a
vital role in a tribe's political integrity, economic security,
health and welfare, and therefore must be strongly considered in
any application of <u>Montana</u>'s second exception, whether or not
Indian or tribal members are parties to the dispute.

Even <u>Montana</u> lends support to the geographic component of
tribal court jurisdiction.  The Supreme Court stated:

> [t]o be sure, Indian Tribes retain inherent sovereign
> power to exercise some forms of civil jurisdiction over
> non-Indians <u>on their reservations</u>, even on non-Indian fee
> lands.

450 U.S. at 565 (emphasis added).  The Court in <u>Montana</u> cited its
earlier holding in <u>United States v. Wheeler</u>, 435 U.S. 313 (1978)
and noted that Indian Tribes are "`unique aggregations possessing
attributes of sovereignty over both their members and <u>their
territory</u>.'"  450 U.S. at 563 (emphasis added).

In finding no jurisdiction here, the court describes tribal
membership as "critical" to the Court's holding in <u>Montana</u>.  <u>Supra</u>
at 20.  Such a characterization oversimplifies <u>Montana</u>, overstates
the role tribal membership plays in a determination of tribal court
jurisdiction and understates the role of territorial integrity.
<u>Montana</u> was the product of several factors, including the nature of

23

the regulation in question and the application of that regulation to fee land. It fully recognized that non-Indians and nonmembers of a tribe can affect the political integrity, economic security, health and welfare of a tribe under the proper circumstances. The <u>Montana</u> Court's establishment of two tribal jurisdiction "exceptions" and its refusal to wholly extend its holding in <u>Oliphant</u>[1] to civil jurisdiction demonstrates the Court's cognizance of the influence of non-Indians and tribal real estate on tribal self-government.

One of the strongest interests that the tribe advances in this case is its interest in providing a forum for this plaintiff. And, the question of North Dakota state court jurisdiction is not as clear-cut as the court suggests. In fact, such jurisdiction is doubtful.

Two important points are relevant to this issue. First, Public Law 280, 28 U.S.C. § 1360, does not, for reasons other than those advanced by the court, have any bearing on this issue. In footnote 6, <u>supra</u> at 19, the court explains that 28 U.S.C. § 1360 applies only to actions to which Indians are parties. The original Public Law 280, however, applied to <u>all</u> "civil causes of action." <u>See</u> Act of Aug. 15, 1953, Pub. L. 280, ch. 505, 67 Stat. 588 (codified as amended at 18 U.S.C. § 1162, 25 U.S.C. §§ 1321-1326, 28 U.S.C. § 1360); <u>see also</u> Felix S. Cohen, <u>Handbook of Federal Indian Law</u> 362-63 (1982 ed.). Under the original Act, assumption of jurisdiction was mandatory for some states and optional for others, including North Dakota. It was not until 1968, when amendments to Public Law 280 were enacted, that state assumption of jurisdiction was limited to actions to which Indians were parties, subject to tribal consent. North Dakota had chosen to assume civil

---

[1]In <u>Oliphant</u>, the Court held that tribal courts could not validly assert criminal jurisdiction over non-Indians. <u>Oliphant v. Suquamish Indian Tribe</u>, 435 U.S. 191 (1978).

jurisdiction before the amendments were adopted,[2] but had voluntarily conditioned its jurisdiction upon consent of the tribes. N.D. Cent. Code § 27-19-01 (1991). The tribes of the Fort Berthold reservation did not consent. <u>Three Affiliated Tribes of the Fort Berthold Reservation v. Wold Eng'g I</u>, 467 U.S. 138 (1984). Thus, North Dakota has no jurisdiction over the Fort Berthold reservation under 28 U.S.C. § 1360.

My second point is more relevant to the question of the authority of a state court to assume jurisdiction over a cause of action arising on an Indian reservation. Even absent jurisdiction conferred by federal statute, state courts may exercise jurisdiction over some civil causes of action arising on reservation lands. The scope of state court jurisdiction is limited by the <u>Williams v. Lee</u> "infringement" test: "whether the state action infringe[s] on the right of reservation Indians to make their own laws and be ruled by them." 358 U.S. at 220. State court jurisdiction cannot be disclaimed, at least where there is no other forum in which to bring an action. <u>Three Affiliated Tribes of the Fort Berthold Reservation v. Wold Eng'g II</u>, 476 U.S. 877 (1986).

Thus, the question of whether a North Dakota state court can provide a forum for Mrs. Fredericks depends upon whether state jurisdiction in this instance would infringe upon the tribe's right to self government. Commentators seem to agree that state courts have subject matter jurisdiction over suits by non-Indians against non-Indians, even when the claim arises in Indian Country, so long as Indian interests are not affected. <u>See</u>, <u>e.g.</u>, Cohen, 352 ("The scope of preemption of state laws in Indian country generally does not extend to matters having no direct effect on Indians, tribes,

_____

[2]As Felix Cohen explains, although the amendments altered any prospective assumption of Public Law 280 jurisdiction, it preserved all jurisdiction previously acquired under the Act. Cohen, 363 n.126.

25

their property, or federal activities.  In these situations state courts have their normal jurisdiction over non-Indians and their property, both in criminal and civil cases."); Sandra Hansen, Survey of Civil Jurisdiction in Indian Country 1990, 16 Am. Indian L. Rev. 319, 346 (1991).

The Three Affiliated Tribes have, however, adopted a tribal code which outlines civil court jurisdiction within the exterior boundaries of the reservation and which, in the absence of federal law to the contrary, imposes tribal law and custom, not North Dakota statute or common law, as controlling precedent for torts occurring within the reservation.  See Tribal Code of the Three Affiliated Tribes of the Fort Berthold Reservation Ch. 1, § 2 (1980); see also Cohen 334-35.

Thus, in this case, state court jurisdiction would infringe upon the tribe's right of self government including the right to provide a forum, indeed the only forum, available to this resident of the reservation.  The accident occurred on Indian land over which the tribe asserts territorial sovereignty and involved a non-Indian truck driver brought onto the reservation by a commercial contract between the tribe and his employer.  Even though Mrs. Fredericks was a non-Indian, she had long resided on the reservation with a tribal member spouse (now deceased) and is the mother of adult children who are enrolled members of the tribe. Had either accident participant been an Indian, the situs of the accident on the reservation would have clearly dictated tribal court jurisdiction as established in Brendale, Iowa Mutual, National Farmers Union and Montana.  The tribal court has jurisdiction over Mrs. Fredericks' claim.  I dissent from the court's ruling to the contrary.

26

FLOYD R. GIBSON, Circuit Judge, with whom McMILLIAN, BEAM, and MURPHY, Circuit Judges, join, dissenting.

I agree with Judge McMillian's and Judge Beam's dissents.  I write separately to express my dismay at this Court's unduly narrow view of "limited sovereignty."  The type of "limited sovereignty" allotted by this Court to the tribe is, in fact, no real sovereignty at all.

Whether framed in terms of inherent tribal sovereignty under Iowa Mutual Insurance Co. v. LaPlante, 480 U.S. 9, 18 (1987), or tribal interests under Montana v. United States, 450 U.S. 544, 565- 66 (1981), the power to adjudicate everyday disputes occurring within a nation's own territory is among the most basic and indispensable manifestations of sovereign power.  As Chief Justice Marshall observed:

> No government ought to be so defective in its organization, as not to contain within itself, the means of securing the execution of its own laws against other dangers than those which occur every day.  Courts of justice are the means most usually employed; and it is reasonable to expect, that a government should repose on its own courts, rather than on others.

Cohens v. Virginia, 19 U.S. (6 Wheat.) 264, 387-88 (1821).  This case does not present an extraordinary occurrence. As the majority opinion notes, this case involves "an ordinary run-of-the-mill automobile accident."  Ante at 18.  The majority opinion today denies the tribe the ability to adjudicate the type of basic disputes that occur daily within Indian territory unless these disputes involve tribal members.  Such a restriction interferes with the tribe's ability to manage its affairs by compromising its ability to deal with non-tribe members who happen to wreak havoc on tribal land.

I believe that the analysis and underlying rationale set forth in Montana have no relevance outside the narrow context of a

27

tribe's ability to regulate fee lands owned by non-Indians.  450
U.S. at  557-67.  As such, I would limit the rule of that case to
its facts and rely instead on the broad scope of inherent tribal
sovereignty outlined in cases such as <u>Iowa Mutual</u>.  480 U.S. at
18.[1]

Even if I were convinced that the reach of <u>Montana</u> is as broad
as the majority of this Court believes it to be, I believe that
this case implicates tribal interests and, as such, falls squarely
under either of the two <u>Montana</u> exceptions.  I believe that this
case meets the "consensual relationship" test under the first
<u>Montana</u> exception because it arose as a direct result of A-1's
consensual commercial contacts with the tribe.  <u>See</u> 450 U.S. at
565-66.  Had A-1 not subcontracted with LCM Corporation, a
corporation wholly owned by the tribe, to perform construction work
on a tribal community building within the boundaries of the
reservation, the accident would never have occurred.  The majority
claims that there is "no proof (as opposed to allegations) . . . to
support the district court's finding of fact that A-1 was in
performance of the contract at the time of the accident."  <u>Ante</u> at
3, note 1.  I, however, fail to see any other plausible explanation
as to why a gravel truck owned by A-1, a non-Indian-owned company,
was on tribal land at the time of the collision.  Because I believe
that the accident clearly arose as the result of A-1's consensual
relationship with the tribe and its members, I believe that the

---

[1]     Tribal authority over the activities of non-Indians on
    reservation lands is an important part of tribal
sovereignty.  Civil jurisdiction over such activities
presumptively lies in    the tribal courts unless affirmatively
limited by a specific    treaty provision or federal statute.
Because the Tribe    retains all inherent attributes of
sovereignty that have not    been divested by the Federal
Government, the proper inference    from silence is that the
sovereign power remains intact.

Citations and quotation omitted.

28

tribe retains the inherent sovereign power to exercise civil jurisdiction over A-1 under the first Montana exception.

I also believe that the tribe retains the inherent power to exercise civil authority over A-1 under the second Montana exception because A-1's conduct on tribal land "threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." 450 U.S. at 566. The majority dismisses the tribal interests at stake here as a "desire to assert and protect excessively claimed sovereignty." Ante at 19. As previously observed, however, the ability of a sovereign, even a limited sovereign, to adjudicate the everyday affairs and accidents occurring within its borders and provide a forum for its citizens is one of the most basic and indispensable aspects of sovereignty. Aside from the threat to the tribe's political integrity, the majority opinion also unfairly discounts the effect of A-1's conduct on the health and welfare of the tribe. Ante at 18-20. While the immediate victim of the collision, Gisela Fredericks, is not a member of the tribe, she is nonetheless a longtime resident of the reservation whose husband and adult children are enrolled tribal members. To claim that A-1's conduct on tribal land had no effect on the health or welfare of the tribe is simply unrealistic and not in accordance with the facts.

For the aforementioned reasons, I would affirm the order of the district court.

McMILLIAN, Circuit Judge, with whom FLOYD R. GIBSON, BEAM, and MURPHY, Circuit Judges, join, dissenting.

I join in Judge Beam's opinion concurring in part and dissenting in part, particularly the emphasis on the importance of geography or territory in analyzing issues of tribal sovereignty. I write separately to set forth the reasons why I would hold that

29

the federal district court, and the tribal courts, correctly decided that the tribal court has subject matter jurisdiction over this reservation-based tort action between non-tribal members.

There are no disputed issues of fact relevant to the jurisdiction issue. None of the parties are tribal members. Gisela Fredericks is a resident of the reservation; the truck driver, Lyle Stockert, and his employer, A-1 Contractors, are not residents, but A-1 was performing work on the reservation under a subcontract agreement with LCM Corp., a corporation wholly owned by the tribe, in connection with the construction of a tribal community building. Because the accident occurred within the exterior boundaries of the reservation, on a state highway right-of-way,[1] the cause of action arose on the reservation. The tribal code establishes personal and subject matter jurisdiction and applies tribal law and custom.

The legal issue presented, tribal court civil jurisdiction, is a question of federal law subject to de novo review. See, e.g., FMC v. Shoshone-Bannock Tribes, 905 F.2d 1311, 1313-14 (9th Cir. 1990), cert. denied, 499 U.S. 943 (1991). The jurisdiction issue is properly presented for determination on the merits. Tribal remedies have been exhausted, and we have the benefit of the tribal trial and appellate courts' opinions as well as that of the federal district court.

---

[1]Rights-of-way are part of "Indian country" as defined by federal law. 18 U.S.C. § 1151 ("Indian country" includes "all land within the limits of any reservation under the jurisdiction of the United States government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation"). "While [18 U.S.C.] § 1151 is concerned, on its face, only with criminal jurisdiction, the [Supreme] Court has recognized that it generally applies as well to questions of civil jurisdiction." DeCoteau v. District County Court, 420 U.S. 425, 427 n.2 (1975).

30

I would hold the tribal court has civil jurisdiction because of the presumption in favor of inherent tribal sovereignty, Montana applies only to issues involving fee lands, Iowa Mutual establishes more than a rule of exhaustion of tribal remedies, the Handbook of Federal Indian Law does not definitively resolve the issue, and state court jurisdiction does not preclude tribal court jurisdiction. Finally, I would hold that even if Montana applies, providing a forum for reservation-based tort actions, even where the parties are non-Indian, falls within both Montana exceptions.


INHERENT TRIBAL SOVEREIGNTY


The majority opinion would not extend inherent tribal sovereignty over the activities of non-members, absent consent or some direct effect on the tribe. I remain convinced that the opposite presumption applies, that is, that "[c]ivil jurisdiction over such activities presumptively lies in the tribal courts unless affirmatively limited by a specific treaty provision or federal statute." Iowa Mutual Insurance Co. v. LaPlante, 480 U.S. 9, 18 (1987) (Iowa Mutual). See Hinshaw v. Mahler, 42 F.3d 1178, 1180-81 (9th Cir.) (tribal court jurisdiction over action brought by tribal member on behalf of non-tribal member child against non-tribal member arising out of car accident on reservation), cert. denied, 115 S. Ct. 485 (1994).


Indian tribes possess "'inherent powers of a limited sovereignty which has never been extinguished.'" United States v. Wheeler, 435 U.S. 313, 322 (1978) (emphasis omitted), citing Felix S. Cohen, Handbook of Federal Indian Law 122 (1942 ed.). The Supreme Court has repeatedly emphasized that "there is a significant geographical component to tribal sovereignty." White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 151 (1980) (pre-emption of state authority over non-Indians acting on tribal reservations). See generally Allison M. Dussias,

31

Geographically-Based and Membership-Based Views of Indian Tribal Sovereignty: The Supreme Court's Changing Vision, 55 U. Pitt. L. Rev. 1 (1993). Thus, "Indian tribes retain 'attributes of sovereignty over both their members and their territory' to the extent that sovereignty has not been withdrawn by federal statute or treaty." Iowa Mutual, 480 U.S. at 14, citing United States v. Mazurie, 419 U.S. 544, 557 (1975) (emphasis added). Inherent tribal sovereignty "exists only at the sufferance of Congress and is subject to complete defeasance. But until Congress acts, the tribes retain their existing sovereign powers. In sum, Indian tribes still possess those aspects of sovereignty not withdrawn by treaty or statute, or by implication as a necessary result of their dependent status." United States v. Wheeler, 435 U.S. at 323 (emphasis added). Implicit divestiture of inherent sovereignty has been found necessary only

> where the exercise of tribal sovereignty would be inconsistent with the overriding interests of the National Government, as when the tribes seek to engage in foreign relations, alienate their lands to non-Indians without federal consent, or prosecute non-Indians in tribal courts which do not accord the full protections of the Bill of Rights.

Washington v. Confederated Tribes of Colville Reservation, 447 U.S. 134, 153-54 (1980) (footnote omitted).

> The federal policy favoring tribal self-government operates even in areas where state control has not been affirmatively pre-empted by federal statute. "[A]bsent governing Acts of Congress, the question has always been whether the state action infringed on the rights of reservation Indians to make their own laws and be ruled by them."

Iowa Mutual, 480 U.S. at 14, citing Williams v. Lee, 358 U.S. 217, 220 (1959). "Because the Tribe retains all inherent attributes of sovereignty that have not been divested by the Federal Government, the proper inference from silence . . . is that the sovereign power

32

. . . remains intact." <u>Merrion v. Jicarilla Apache Tribe</u>, 455 U.S. 130, 149 n.14 (1982).

There is no ground for divestiture of inherent tribal sovereignty in the present case. No specific treaty provision or federal statute has been shown to affirmatively limit the power of the tribal courts of the Three Affiliated Tribes over civil actions that arise on the reservation, and the exercise of tribal civil jurisdiction over a tort action arising on the reservation between non-members does not implicate foreign relations, alienation of land, or the criminal prosecution of non-Indians.

STATUS OF LANDS AT ISSUE

First, <u>Montana v. United States</u>, 450 U.S. 544 (1981), <u>Brendale v. Confederated Tribes & Bands of the Yakima Indian Nation</u>, 492 U.S. 408 (1989) (<u>Brendale</u>), and <u>South Dakota v. Bourland</u>, 113 S. Ct. 2309 (1993) (<u>Bourland</u>), are not controlling. <u>Montana</u> and <u>Brendale</u> involved attempts by the tribes to regulate the activities of non-members on fee land, that is, land owned by non-members within the reservation; <u>Bourland</u> involved lands taken by the federal government for the construction of a dam and reservoir. The distinction between land conveyed in fee to non-Indians pursuant to the Indian General Allotment Act of 1887, 24 Stat. 388, which was intended to eliminate the reservations and assimilate the Indian peoples, or, in <u>Bourland</u>, land taken by the federal government, and land owned by the tribe or trust land held by the federal government in trust for the tribe or individual members of the tribe, is fundamental to the analysis in <u>Montana</u>, <u>Brendale</u> and <u>Bourland</u>. The present case does not involve fee land or land taken by the federal government for public use. For that reason, I would apply <u>Montana,</u> and its exceptions, only to fee lands owned by non-tribal members.

A close reading of Justice Stewart's opinion for the Court in Montana demonstrates the importance of geographical or territorial status of the land at issue to tribal sovereignty analysis. The Court's analysis differentiated between fee lands and lands owned by the tribe or held in trust for the tribe. The competing regulatory authorities were the tribe and the state, each of which asserted the authority to regulate hunting and fishing by non-members within the reservation. The Court framed the issue in terms of "the sources and scope of the power of an Indian tribe to regulate hunting and fishing by non-Indians on lands within its reservation owned in fee simple by non-Indians." 450 U.S. at 547 (emphasis added), 557. The Supreme Court held that the tribe could prohibit non-members from hunting or fishing on land owned by the tribe or trust land, id. at 557, and, if the tribe permitted non-members to fish or hunt on such lands, could condition their entry by charging a fee or establishing bag and creel limits. Id. However, the Court held inherent tribal sovereignty over the reservation did not extend to tribal regulation of non-Indian fishing and hunting on reservation land owned in fee by non-members. Id. at 564-65. The Court admitted that "Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands." Id. at 565 (emphasis added). The first Montana exception recognizes tribal regulatory authority over non-members who enter consensual relationships with the tribe or its members. Id. The second Montana exception expressly recognizes a tribe's "inherent power to exercise over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." Id. (emphasis added). If inherent tribal sovereignty can include civil jurisdiction over non-Indians on fee lands within the reservation, it should include civil jurisdiction over non-Indians on tribal land or trust land within the reservation. This is

34

because tribal civil jurisdiction is more restricted on fee land than on tribal or trust land.

Brendale also involved fee lands within the reservation; the competing regulatory authorities were once again the tribe and the state (or, more precisely, one county). The issue presented was the scope of the second Montana exception, that is, "whether, and to what extent, the tribe has a protectible interest in what activities are taking place on fee land within the reservation and, if it has such an interest, how it may be protected." 492 U.S. at 430 (emphasis added). The tribal zoning ordinance applied to all lands located within the reservation, part of which was located in Yakima County. The county zoning ordinance applied to all lands located within the county, except for tribal trust lands. Most of the reservation was tribal trust land, referred to as the "closed area"; the rest was fee land located through out the reservation in a checkerboard pattern but mostly in one part of the reservation, referred to as the "open area." The county had approved two proposed developments, one in the open area and one in the closed area, on fee lands owned by non-members of the tribe, that conflicted with the tribal zoning ordinance. The tribe sued to stop the proposed development and challenged the county's zoning authority over the reservation.

The judgment of the Court was divided. The Court, in an opinion by Justice White, upheld application of the county zoning ordinance to the fee land located within the open area, under both the treaty language, id. at 422-25, and the Montana inherent tribal sovereignty analysis. Id. at 425-32. However, the Court, in an opinion by Justice Stevens, upheld application of the tribal zoning ordinance to the fee land located within the closed area. Id. at 433-47 (differentiating between "essential character" of closed and open areas and noting open area was at least half-owned by non-members, had lost its character as an exclusive tribal resource, and, as practical matter, had become integrated part of

35

county that is not economically or culturally delimited by reservation boundaries). Although the opinions reach different decisions for different reasons, it is important to note that the regulatory dispute involved the authority to control development of fee lands and not land owned by the tribe or held in trust for the tribe. Cf. United States ex rel. Morongo Band of Mission Indians v. Rose, 34 F.3d 901, 906 (9th Cir. 1994) (Montana exceptions are "relevant only after the court concludes that there has been a general divestiture of tribal authority over non-Indians by alienation of the land"). Justice Blackmun would have upheld the tribe's exclusive authority to zone reservation land, including fee lands, and thus concurred in part and dissented in part. Id. at 448-68.

In Bourland the competing regulatory authorities were once again the tribe and the state. At issue were not fee lands, however, but former trust and fee lands that had been taken by the United States for construction of a dam and reservoir for flood control. The taking authorization also "opened" the taken land for recreational use, including hunting and fishing, by the public at large. As in Montana, the tribe sought to regulate hunting and fishing by non-members on the reservation, including the land taken for the flood control project. The state filed suit to enjoin the tribe from excluding non-Indians from hunting and fishing on the taken lands within the reservation. The Court, in an opinion by Justice Thomas, held that Congress, in enacting the flood control legislation, had abrogated the tribe's right under the relevant treaty to exclude non-Indians from the taken lands. 113 S. Ct. at 2316. The Court also held that inherent tribal sovereignty did not enable the tribe to regulate non-Indian hunting and fishing in the taken area in the absence of any evidence in the relevant treaties or statutes that Congress intended to allow the tribe to assert such regulatory jurisdiction. Id. at 2319-20. The Court, however, remanded the case for further consideration of whether the tribe retained the inherent sovereignty to regulate non-Indian hunting

36

and fishing in the taken area under the two <u>Montana</u> exceptions. <u>Id.</u> at 2320. Justice Blackmun dissented and would have held that the tribe had the authority to regulate non-Indian hunting and fishing in the taken area because the relevant statutes did not affirmatively abrogate either the tribe's treaty rights or inherent tribal sovereignty. <u>Id.</u> at 2323-24.

EXHAUSTION OF TRIBAL REMEDIES

Next, <u>National Farmers Union Insurance Cos. v. Crow Tribe</u>, 471 U.S. 845 (1985) (<u>National Farmers Union</u>), and <u>Iowa Mutual</u> do not establish only a rule of exhaustion requiring tribal courts to determine their jurisdiction in the first instance. The rule of exhaustion established in <u>National Farmers Union</u> is premised upon the Court's decision that tribal civil jurisdiction over non-Indians is not automatically foreclosed by <u>Oliphant v. Suquamish Indian Tribe</u>, 435 U.S. 191 (1978) (holding federal legislation conferring jurisdiction on federal courts to try non-Indians for offenses committed in Indian country had implicitly pre-empted tribal criminal jurisdiction over non-Indians). <u>National Farmers Union</u> recognized that an exhaustion requirement would have been superfluous if there were no possibility of tribal civil jurisdiction over non-Indians. 471 U.S. at 854 (because if <u>Oliphant</u> applied, federal courts would always be the only forums for civil actions against non-Indians). <u>National Farmers Union</u> thus did not foreclose tribal court jurisdiction over a civil dispute involving a non-Indian defendant. <u>Id.</u> at 855 (school district defendant). <u>Iowa Mutual</u> not only reaffirmed the rule of exhaustion established in <u>National Farmers Union</u> but also expressly stated that "[t]ribal authority over the activities of non-Indians on reservation lands is an important part of tribal sovereignty" and that "[c]ivil jurisdiction over such activities presumptively lies in the tribal courts unless affirmatively limited by a specific treaty provision or federal statute." 480 U.S. at 18; <u>see</u> <u>Brendale</u>, 492 U.S. at 454-55 n.5 (Blackmun, J., concurring in part

37

and dissenting in part).  This is an affirmative recognition that tribal court civil jurisdiction over reservation-based tort actions against non-Indians is part of inherent tribal sovereignty. Otherwise, there would be no point in requiring exhaustion of tribal remedies to permit the tribal courts to evaluate the factual and legal bases of any challenges to their jurisdiction because the tribal courts would never have jurisdiction.

HANDBOOK OF FEDERAL INDIAN LAW

The landmark treatise does not definitively resolve this issue.  As noted by the majority opinion, Felix S. Cohen's Handbook of Federal Indian Law 342-43 (1982 ed.) does state that "[t]ribal courts probably lack jurisdiction over civil cases involving only non-Indians in most situations, since it would be difficult to establish any direct impact on Indians or their property." However, another section of the Handbook supports tribal civil jurisdiction over non-Indians:

> Indian tribes retain civil regulatory and judicial jurisdiction over non-Indians.  The extent of tribal civil jurisdiction over non-Indians, however, is not fully determined.
>
> Analysis of the actions of each of the three federal branches demonstrates that civil jurisdiction over non-Indians has not been withdrawn and that the exercise of such jurisdiction is consistent with the tribes' dependent status under federal law. . . .  In the civil field [contrary to the rule in criminal matters], Congress has never enacted general legislation to supply a federal or state forum for disputes between Indians and non-Indians in Indian country.  Furthermore, although treaties between the federal government and Indian tribes sometimes required tribes to surrender non-Indian criminal offenders to state or federal authorities, Indian treaties did not contain provision for tribal relinquishment of civil jurisdiction over non-Indians. Congress' failure to regulate civil jurisdiction in Indian country suggests both that there was no jurisdictional vacuum to fill and that Congress was less concerned with tribal civil, non-penal jurisdiction over

38

non-Indians than with tribal jurisdiction over the personal liberty of non-Indians.

The executive branch of the federal government has long acted on the assumption that Indian tribes may subject non-Indians to civil jurisdiction. Although the Attorney General and the Solicitor of the Department of the Interior have opined since 1834 that Indian tribes lack criminal jurisdiction over non-Indians, several opinions have upheld tribal civil jurisdiction. The Attorney General sustained tribal civil jurisdiction in 1855. A comprehensive 1934 Opinion of the Solicitor of the Department of the Interior concluded that "over all the lands of the reservation, whether owned by the tribe, by members thereof, or by outsiders, the tribe has the sovereign power of determining the conditions upon which persons shall be permitted to enter its domain, to reside therein, and to do business." . . .

. . . .

The breadth of [the tribes'] retained power over non-Indians in civil matters has not been finally resolved. . . .

. . . .

A tribe presumptively has an interest in activities on lands belonging to the tribe or its members, so tribal control over Indian trust land can be the basis for extensive tribal jurisdiction over non-Indians in civil matters. Regardless of land ownership, tribal jurisdiction within reservations can also be based on transactions between non-Indians and Indians or tribes or on non-Indian activities that directly affect Indians or their property.

Id. at 253-57 (footnotes omitted). Neither excerpt definitively resolves the issue of tribal court jurisdiction over a civil suit brought against a non-Indian arising from a tort occurring on the reservation.

STATE COURT JURISDICTION

The possibility of state court jurisdiction does not preclude tribal court jurisdiction. See Hinshaw v. Mahler, 42 F.3d at 1180

39

(concurrent state and tribal jurisdiction over certain civil matters occurring on Flathead Reservation, including operation of motor vehicles on public roads), citing Larivee v. Morigeau, 184 Mont. 187, 602 P.2d 563, 566-71 (1979) (same), cert. denied, 445 U.S. 964 (1980).  However, tribal court jurisdiction may preclude state court jurisdiction, particularly where the tribe has established tribal courts and adopted a tribal code which provides for personal jurisdiction over non-Indians, subject matter jurisdiction over torts arising on the reservation, and application of tribal law.  This is particularly true if one views the issue in terms of a state's attempt to assert its civil authority over the conduct of non-Indians on the reservation, which is usually denied, see, e.g., Williams v. Lee, 358 U.S. 217, as opposed to a tribe's attempt to assert its civil authority over the conduct of non-Indians on the reservation, which is usually upheld.  See, e.g., City of Timber Lake v. Cheyenne River Sioux Tribe, 10 F.3d 554, 558 (8th Cir. 1993) (reserving inherent tribal sovereignty issue), cert. denied, 114 S. Ct. 2741 (1994).  For example, in the landmark case of Williams v. Lee the Court held that the state court did not have jurisdiction over an action brought by a non-Indian who operated a general store on a reservation to recover money for goods sold to Indians because "the exercise of state jurisdiction [under the circumstances] would undermine the authority of the tribal courts over Reservation affairs and hence would infringe on the right of the Indians to govern themselves." 358 U.S. at 223; cf. Cowan v. Rosebud Sioux Tribe, 404 F. Supp. 1338, 1341 (D.S.D. 1975) (upholding tribal court jurisdiction over tribe's suit against non-Indian lessee of tribal land).

TRIBAL SELF-GOVERNMENT

Finally, even assuming for purposes of analysis that Montana is not limited to disputes involving fee lands, a "consensual relationship" existed between A-1 and Stockert and the tribe by virtue of the subcontract within the meaning of the first Montana

exception.  In addition, the allegedly tortious conduct of A-1 and Stockert occurred on a state highway right-of-way on the reservation.  This conduct by non-Indians within the reservation threatened the tribe's interest in the safe operation of motor vehicles on the roads and highways on the reservation.  See Hinshaw v. Mahler, 42 F.3d at 1180; cf. Sage v. Lodge Grass School District No. 27, 13 Indian L. Rep. 6035, 6039 (Crow Ct. App. 1986) (remand following National Farmers Union; student hit by motorcycle on school parking lot; tribe has legitimate interest in protecting health and safety of school children attending school within reservation).  The tribe also has an interest in affording those who have been injured on the reservation with a judicial forum.  This interest is admittedly abstract compared to the safe operation of motor vehicles.  However, disregarding the jurisdiction of tribal courts, which play a vital role in tribal self-government, undermines their authority over reservation affairs and to that extent imperils the political integrity of the tribe.

For these reasons, I would affirm the order of the district court holding the tribal court has subject matter jurisdiction over this reservation-based tort action between non-tribal members.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

41